

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
10/31/2007

| | | |
|---|---|---|
| **IN RE:** | § | |
| **MAGNA CUM LATTE, INC.,** | § | **CASE NO: 07-31814** |
| **Debtor** | § | |
| | § | **CHAPTER  -11** |
| | § | |
| **MAGNA CUM LATTE, INC.,** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 07-03304** |
| | § | |
| **DIEDRICH COFFEE, INC.,** *et al* | § | |
| **Defendants.** | § | |

## <u>AMENDED MEMORANDUM OPINION</u>

For the reasons set forth below, the Court:

● denies plaintiff Magna's motion for summary judgment;

● denies defendant Diedrich's motion for summary judgment on Magna's implied covenant of good-faith, breach of the Area Development Agreement, and wrongful termination claims;

● grants Diedrich's motion for summary judgment on Magna's breach of sublease, franchise, and purchase contracts, common law fraud, fraud in a real estate transaction, fraudulent concealment, negligent misrepresentation, promissory estoppel, disparagement, tortious interference with prospective business relationships, and tortious interference with a contractual relationship claims;

● grants defendant Comerica's motion for summary judgment on all issues.

### Background

The present dispute arises from the purchase of three coffee franchises.

Defendant Diedrich Coffee, Inc. ("Diedrich") is a California-based coffee business that operated coffeehouses and sold Diedrich franchises.  Diedrich owned four coffeehouses in Houston, Texas.  Dirk J. Smith ("Smith") formed plaintiff Magna Cum Latte, Inc. ("Magna") to purchase the Houston coffeehouses and Chrie8, Inc. ("Chrie8") to manage Magna.  Smith is the

1

sole shareholder of both Magna and Chrie8.   On May 9, 2001, Magna and Diedrich executed franchise, sublease, and purchase agreements with respect to three of the Houston coffeehouses (the "Westheimer Store," "Montrose Store," and "Clear Lake Store").   Diedrich closed the fourth.   The parties also executed an Area Development Agreement (ADA) that granted Magna rights to develop additional Diedrich coffeehouses and kiosks within the Houston area.[1]   The ADA also contained a "minimum development obligation" that required Magna to open approximately one new coffeehouse per year.   Magna paid $1,025,000 for the franchise, lease, and development rights.   Defendant Comerica Bank ("Comerica") provided an $819,000 loan to finance the purchase.   The loan was secured by a personal guarantee from Smith and his wife (the "Smiths") and a security interest in the Smiths' home.

The sublease agreements quickly sparked contention.   The subleases provided for payments to be based in part on a percentage of gross sales.   However, sales never met projections.   Consequently, Diedrich's obligations under its Master Lease exceeded Magna's obligations under the sublease.   In early 2004, Diedrich's situation worsened when its obligation under the Master Lease increased by $1,000 per month for the Montrose store.   From 2003 until the Westheimer Store closure in 2006, Diedrich repeatedly requested Magna to renegotiate the subleases.   Magna refused.

The ADA also created tension.   Magna failed to meet its minimum development obligations.   No new Diedrich franchises were opened.

On October 26, 2004, Magna and Diedrich sought to resolve their disputes by a Letter Agreement.   The Letter Agreement extended Magna's development rights through May of 2006, instituted a new royalty structure, and contained mutual releases from claims arising prior to the

---

[1] The ADA gave Magna the exclusive right to develop Diedrich coffeehouse in the Houston area and a non-exclusive right to develop Diedrich kiosks on the University of Houston campus and near the Clear Lake Store.

Letter Agreement.  The Letter Agreement also waived Diedrich's right to terminate the ADA based on Magna's failure to meet the minimum development requirements.

Unfortunately, the Letter Agreement did not save Magna and Diedrich's commercial relationship.  In 2005 and 2006, Magna began negotiations with the University of Houston and Rice University to establish kiosks on their campuses.  However, agreements were not obtained. Magna blamed the negotiations' failures on Diedrich's lack of cooperation.  In November of 2006, Diedrich did not renew its Master Lease for the Westheimer Store.  Magna attempted to negotiate a new lease directly with the Westheimer property's owner, T-Con Properties, Ltd. ("T-Con").  However, Magna and T-Con were unable to reach an agreement.  Magna alleges that Diedrich sabotaged their negotiations by disparaging Magna's financial condition.  During this same period, Diedrich sold forty-seven Diedrich stores to Starbucks Corporation.  Diedrich also signed a non-compete provision with Starbucks.  Soon after the Westheimer Store closed, Magna defaulted on its obligations to Diedrich and Comerica Bank.  Magna filed a chapter 11 bankruptcy petition on March 12, 2007.

On June 26, 2007, Magna filed this adversary proceeding against Diedrich.  Magna's complaint focuses on the express terms of their agreements with Diedrich, alleged misrepresentations made by Diedrich prior to execution of the agreements, and Diedrich's conduct following the 2001 sale and 2006 decision not to renew the Westheimer Store lease. Essentially, Magna alleges that Diedrich violated express provisions of their agreements, and engaged in bad-faith conduct that doomed Magna's business.  Magna asserted twelve causes of action.  Magna seeks lost profits and other damages totaling over $12,000,000.

On April 17, 2007, Comerica filed a suit against Magna, Chrie8 and Dirk and Julie Smith (the "Magna Defendants") in state court.  Comerica's complaint seeks judgment for the unpaid

balance of the $819,000 note plus accrued interest and attorney's fees. The Magna Defendants filed a Plea of Intervention and Cross Claims asserting four claims against Comerica.  The lawsuit was removed to this Court and consolidated with the adversary proceeding filed by Magna.

On July 20, 2007, Magna filed a partial summary judgment motion for breach of contract and breach of the implied covenant of good faith.  On August 29, 2007, Diedrich filed a summary judgment motion on all twelve causes of action.  On August 30, 2007, Comerica filed a summary judgment motion for its breach of promissory note and personal guarantee claims, and the Magna Defendants' four claims.

This Court issued its original Memorandum Opinion on the summary judgment motions on October 10, 2007.  On October 22, 2007, Magna, Chrie8, and the Smiths filed a timely motion for reconsideration.  The Court has carefully considered the motion for reconsideration and amended its opinion in light of the issues raised in the motion.  However, the Court's original order granting summary judgment requires no amendment.

## Jurisdiction and Venue

This Court has jurisdiction of this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. §1409.

## Summary Judgment Standard

A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact. *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005).  Material facts are those that could affect the outcome of the

action or could allow a reasonable fact finder to find in favor of the non-moving party. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005).

The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial. At all times, a court views the facts in the light most favorable to the non-moving party. *Rodriguez v. ConAgra Grocery Products, Co.*, 436 F.3d 468, 473 (5th Cir. 2006). However, to weigh evidence would result in a credibility determination which is not part of the summary judgment analysis. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 762 (5th Cir. 2001); *See MAN Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478 (5th Cir. 2006)**.** A court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

If the movant bears the burden of proof, a successful motion must present evidence that would entitle the movant to judgment at trial. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003); *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Warfield*, 436 F.3d at 557. The non-moving party has a duty to respond with specific evidence demonstrating a triable issue of fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 402 (5th Cir. 2005). When identifying specific evidence in the record, the non-movant must articulate how that evidence supports its position. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).

### Analysis

Magna's complaint seeks recovery based on 12 different legal theories. Two arise directly from the agreements. The remaining ten arise from Diedrich's alleged statements and

omissions.  Magna's complaint also seeks recovery from Comerica under separate legal theories.

The Court considers the claims against Diedrich and Comerica separately.

**A. Claims Against Diedrich.**

### *i. Breach of Express Terms of Sublease, Franchise, and Purchase Agreements*

The Westheimer Sublease is governed by Texas law.[2] Under Texas law, a breach of

contract claim has three elements: "(1) the existence of a valid contract, (2) the plaintiff's

performance or tendered performance, (3) the defendant's breach of the contract, and (4)

damages as a result of the breach." *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d

908 (Tex. App.—Dallas 2006, no pet. h.) (citing *Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex.

App.—Beaumont 2003, no pet. h.); *St. Paul Ins. Co. v. Rakkar*, 838 S.W.2d 622, 629 (Tex.

App.—Dallas 1992, writ denied).

Contract interpretation is driven by the contract's express language. *Lenape Resources*

*Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996) ("In construing a written

contract, our primary concern is to ascertain the true intentions of the parties as expressed in the

written instrument."). Generally, contract language is given its plain and ordinary meaning.

*DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999); *Heritage Res., Inc. v.*

*NationsBank*, 939 S.W.2d 118 (Tex. 1996) ("We give terms their plain, ordinary, and generally

accepted meaning unless the instrument shows that the parties used them in a technical or

different sense.").  Additionally, courts "examine the entire document and consider each part

with every other part so that the effect and meaning of one part on any other part may be

determined." *Heritage Res.*, 939 S.W.2d at 121 (Tex. 1996).  Courts consider parol evidence

only if the contract's express terms are ambiguous. *Lenape Res. Corp.*, 925 S.W.2d at 574.

---

[2] The Westheimer Sublease incorporated Diedrich's Master Lease.  The Master Lease provided that Texas law govern disputes arising from the lease.  The parties do not dispute that Texas law governs interpretation of the Westheimer Sublease.

Ambiguity is resolved against the drafter. *Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth*, 578 S.W.2d 109, 115 (Tex. 1978).

Magna alleges that their franchise, sublease, and purchase agreements expressly required Diedrich to maintain its Master Lease of the three properties for at least ten years. The agreements' unambiguous, express terms do not support Magna's contention. Rather than guaranteeing sublease rights for *at least* ten years, the agreements' terms explicitly promised sublease rights for *at most* ten years.

Neither the franchise nor sublease agreements had guaranteed ten-year terms. The franchise and sublease agreements did not have set terms at all. Rather, the franchise and sublease terms were tied to Diedrich's Master Lease of the three properties. The franchise and sublease terms covered only the period covered by Diedrich's Master Lease and terminated upon termination of Diedrich's Master Lease.

The franchise agreement for each coffeehouse provided:

"3.1 <u>Initial Term.</u>  *Subject to earlier termination pursuant to Article 16 [Default and Termination], the "Term" of this Agreement shall begin on the Effective Date and* **continue for a period of 10 years, or unless the term of the Franchisee's lease for the Premises**, if any, **is for less than ten (10) years, including any applicable option periods** *contained in said lease* **which are exercised** *by the Franchise, in which event the* **franchise shall be for a term identical to the term of the Franchisee's lease**." (emphasis added).

The sublease agreement for each coffeehouse provided:

"**<u>Term.</u>**  *The Term of this Sublease shall be for that period, commencing on the Date of Possession and* **terminating upon the sooner of** *(i) ten (10) years, (ii) the* **termination or expiration of the Master Lease**, *or (iii) the termination for any cause whatsoever of the Franchise Agreement.*" *(emphasis added).*

"**<u>Incorporation of Master Lease</u>**.  *The provisions of the Master Lease are incorporated by reference into, and made a part of this Sublease, except for the following paragraph 18.9.  If there is a conflict between provisions in the Master Lease and this Sublease, the Master Lease shall control, except for Article 2 and Article 4, in which the obligations and covenants required by the Master Lease to*

7

> be kept or performed by Sublessor as the Lessee thereof. **Sublessor agrees to maintain the Master Lease during the entire term of this Sublease, subject, however, to any earlier termination of the Master Lease without fault of Sublessor**, *and to pay all rents and taxes provided for therein in accordance with the terms of the Master Lease . . ." (emphasis added).*

The Master Lease *did not* have a ten year term.  The Master Lease provided the following terms for the three stores:

- Westheimer Store: lease expired November 7, 2001, with two five-year renewal options.

- Montrose Store: lease expired on August 31, 2004, with one five-year renewal option.

- Clear Lake Store: lease expired on July 20, 2002, with one five-year renewal option.

The Master Lease's express terms did not require Diedrich to exercise the options.  Even if Diedrich was required to exercise the options, the Master Lease would not provide a ten-year term for the Montrose or Clear Lake stores.  If Diedrich exercised all the options on the Westheimer Store, the Westheimer's sublease term would exceed ten years.  However, the options were discretionary.  Neither the Master Lease nor any express provision in the franchise, purchase, or sublease agreements required Diedrich to exercise the options.

The Master Lease terminated when Diedrich decided not to exercise an option.  Because the franchise and sublease terms were tied to the Master Lease's terms, the franchise and sublease agreements also terminated when Diedrich did not exercise the option.  The result may seem unfair, and Magna may have assumed that Diedrich would exercise the options.  However, the fact remains that nothing in the agreements' express terms required Diedrich to exercise the options.

Magna also alleges a beach of contract claim arising from a "Further Assurances" clause within the Purchase Agreement.  The Purchase Agreement contained the following provision:

"**_Further Assurances._** *Each party agrees that, upon request of the other, it shall from time to time execute and deliver to such other party all instruments and documents of further assurance or otherwise and* **shall do any and all acts and things as may be reasonably required to carry out the obligations of the parties hereunder and to consummate the transactions provided for and contemplated hereby**." (emphasis added).

Magna alleges that the "contemplated" language required Diedrich to exercise the Master Lease option on the Westheimer Store property.   According to Diedrich, all parties "contemplated" that the options would be exercised to ensure that Magna could sublease the three stores for 10 years.

Magna's argument is without merit.   The "Further Assurances" clause is tied to the agreement's express provisions.   The clause *does not* provide that the parties promise to execute and deliver all documents necessary to effectuate the parties' unspoken intent.   The clause is more specific.   The clause provides that the parties promise to undertake the obligations and consummate the transactions *provided in the agreements*.   Specifically, the clause states that the parties promise to undertake actions reasonably required "to carry out the obligations or the parties **hereunder** and to consummate the transactions **provided for and contemplated hereby**." (emphasis added).

As discussed above, none of the agreements required Diedrich to sublease and franchise the Westheimer Store for ten years.   Magna may well have "contemplated" that the sublease would last for ten years.   However, the "Further Assurance" clause does not impose obligations that the parties may have "contemplated" in their own minds but did not express within the actual agreements.   The clause speaks only to transactions and obligations that the Court can infer were "contemplated" from language in the agreements.   If a provision in an agreement does not "contemplate" an obligation, the "Further Assurances" clause does not allow the Court to impose an obligation that may have been "contemplated" in one or both parties' minds, but not

expressed in the actual agreements.   The agreements are silent with respect to Diedrich's obligations to renew the subleases.   Consequently, Diedrich did not violate the "Further Assurances" clause by not executing documents providing for ten-year sublease and franchise terms for the Westheimer Store or by failing to renew the Westheimer lease.

The Court grants summary judgment for Diedrich on Magna's breach of contract claims based on the sublease, franchise, and purchase agreements.

### ii. Breach of Implied Covenant of Good Faith and Fair Dealing

All parties agree that California law governs disputes arising from the franchise and purchase agreements.   Both contain choice of law provisions providing that the agreements shall be governed by California law.

California law imputes an implied covenant of good faith and fair dealing within all contracts, including franchise agreements. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of Cal.*, 36 Cal. 3d 752, 768 (Cal. 1984) (overruled on other grounds); *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (Cal. App. 2 Dist. 1997); *Dayton Time Lock Service, Inc. v. Silent Watchman*, 52 Cal. App. 3d 1 (Cal. App. 2 Dist. 1975).   The covenant applies to a contract's performance and enforcement. REST. (SECOND) OF CONTRACTS §205 (1981). Generally, "the covenant imposes a duty upon a party to a contract not to deprive the other party of the benefits of the contract." *Sutherland*, 53 Cal. App. 4th at 314.   The "scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers, Inc. v. Marathon Dev. Ca., Inc.*, 2 Cal. 4th 342, 373 (Cal. 1992).   The covenant can not *contradict* express contractual provisions or *create* new obligations. *Racine & Laramie, Ltd. v. Dept. of Parks & Recreation*, 11 Cal. App. 4th, 1026, 1032 (Cal. App. 4. Dist.1992).   The covenant can not forbid what a contract expressly allows or

allow what a contract expressly forbids. *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 366 (Cal. App. 3 Dist. 1997) ("As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct"). However, the covenant of good faith and fair dealing is not limited to the contract's expressed terms. *Carma Developers, Inc.* 2 Cal.4th at 373 (Cal. 1992) ("breach of a specific provision of the contract is not a necessary prerequisite").

The covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers, Inc.* 2 Cal.4th at 371. The covenant is perhaps best viewed as an equitable doctrine that imputes norms of fair-dealing where the contract is silent or ambiguous.  The Second Restatement of Contracts uses the following example to illustrate:

> "A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket.  Unless such action was contemplated or is otherwise justified, there is a breach of contract by A."

§205 (1981). The contract's express terms *did not* state that B's exclusive right would extend to centers not then in existence.  Nevertheless, the implied covenant informs the contractual language so that it conforms to what the parties, bounded by norms of good faith and fair-dealing, contemplated.

Diedrich contends that the covenant of good faith and fair dealing is limited to obligations created by the contract.  The contract did not oblige Diedrich to exercise the options. Consequently, Diedrich argues that the implied covenant can not be used to create a new obligation.

Diedrich's argument unduly limits the implied covenant's reach.  An implied covenant would imply nothing if it was limited to rights and obligations expressly provided in the contract. When the contract expressly forbids or allows an act, the implied covenant can not be used to allow what was expressly forbidden or forbid what was expressly allowed. *Locke*, 57 Cal. App. 4th at 366. However, if a contract gives a party discretion to act, rather than expressly allowing or disallowing action, the implied covenant applies. *Id.* at 363 ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.") (citing *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 923 (Cal. 1985)).

Magna and Diedrich's agreements neither expressly allowed nor forbade Diedrich from terminating the Master Lease.[3]  The agreements were silent as to whether Diedrich could decline to exercise the lease options.  The decision to exercise the options was left to Diedrich's discretion.  Consequently, the implied covenant applies to Diedrich's decision to forgo exercising the Westheimer Store option.

Magna contends that Diedrich breached the implied covenant by not renewing the Westheimer Store lease and by making misrepresentations, omissions, and threats throughout its dealings with Magna.  Diedrich contends that it renegotiated agreements and otherwise did all that could be reasonably expected of Diedrich to help Magna make its stores profitable.

---

[3] Diedrich contends that a "No Other Obligations" clause in the franchise agreements expressly allowed Diedrich to refrain from exercising the Westheimer option.  That provision states: "Company shall not be obligated to provide any services to Franchisee except expressly provided herein and any and all other services which Company may provide to Franchisee during the Term shall be at its sole discretion and Company may cease to provide the same without notice of further obligation to Franchisee." However, the clause is within the Franchise Agreement, not the Sublease Agreement.  Moreover, exercising a lease option can not be considered a "service" under the Franchise Agreement's "No Other Obligations" clause.  The "No Other Obligations" clause follows clauses explaining the "services" Diedrich is obligated to provide franchisees.  Those "services" include training, advertising, and supplying franchises with training, store designs, and coffeehouse supplies.  In other words, the clause speaks to the tangible assistance Diedrich agrees to provide franchisees.  The discretionary decision to exercise a lease option is not a "service" according to the meaning given by the franchise agreements' provisions or ordinary English usage.

A triable issue of material fact exists with respect to Magna's implied covenant claim. Both parties submitted evidence sufficient to defeat the other's summary judgment motion on the implied covenant claim.

Magna offered evidence of the following facts:

● The purchase and finance agreements.  According to Magna, neither Magna nor any reasonable party would have agreed to pay $1,025,000 and obtain over $800,000 in financing for franchise and sublease rights lasting for less than ten years.  The Westheimer Store Master Lease was set to expire within months of the purchase.  If Diedrich was free to not exercise the renewal options, Magna would have never paid $1,025,000 for rights that could be terminated within months of the purchase.

● Omissions and misrepresentations.  Magna offered affidavits and deposition testimony suggesting that Diedrich misrepresented the stores' profitability by overstating expected sales increases and omitting expenses.

● Financial threats.  Magna offered affidavits and deposition testimony suggesting that Diedrich threatened to increase Magna's royalty payments and impose other financial burdens if Magna refused to re-negotiate the "rent formulas" used to determine Magna's monthly rent for the stores.

● Execution and breach of a Letter Agreement between Magna and Diedrich.  On October 26, 2004, Magna and Diedrich executed a Letter Agreement providing: mutual releases for any breaches or defaults that occurred prior to the agreement, waiver of the minimum development agreements, and an extension of the ADA.  In support of its claim, Magna presented evidence that Diedrich decided not to renew the Westheimer Store lease approximately one month after executing the Letter Agreement, and precluded Magna from developing a kiosk on the University of Houston campus by failing to provide a requested document and contact person.

Diedrich offered evidence of the following facts:

● A denial that Diedrich or Comerica represented that leases would be retained for ten years.

● Good-faith attempts to negotiate lease renewals, among other instances of good-faith business dealings with Magna.  Specifically, Diedrich voluntary reduced royalty payments owed by Magna, notified Magna of its intent to not exercise the Westheimer store option ten months before the lease's expiration, and encouraged T-Con to negotiate a new lease directly with Magna.

Because a genuine issue of material fact remains, the Court denies both parties' cross motions for summary judgment with respect to the implied covenant claim.

### iii. Breach of Area Development Agreement

The Area Development Agreement ("ADA") granted Magna exclusive and non-exclusive rights to develop coffeehouses and kiosks in the Houston area.  The ADA also imposed minimum development obligations on Magna that required Magna to develop new Diedrich coffeehouses yearly.  Failure to comply with the minimum develop obligation was grounds for termination of the agreement.  From 2001 through 2004, Magna never developed a new Diedrich coffeehouse or kiosk.  Nevertheless, the 2004 Letter Agreement extended the ADA until May 31, 2006.  The Letter Agreement also waived Diedrich's right to terminate the ADA based on Magna's failure to meet the minimum development requirements.

Magna asserts that Diedrich violated the ADA by failing to cooperate with Magna's development negotiations with the University of Houston.  In late 2005 and early 2006, Magna and the University of Houston began negotiating over construction of a kiosk on the University of Houston campus.  By January of 2006, the University of Houston had preliminarily approved a new kiosk.  Magna alleges that, before the kiosk could be finally approved, the University required a copy of Diedrich's form Franchise Agreement and contact information for a Diedrich representative.  Magna asked Diedrich to provide the document and contact information. Despite repeated requests, Diedrich did not comply.  Consequently, the University ended negotiations.  Magna also asserts that it was close to obtaining approval from Rice University to build a second kiosk.  However, after Diedrich failed to honor Magna's information requests for the University of Houston kiosk, Magna abandoned the Rice University venture.

Diedrich asserts that Diedrich owed no obligations under the ADA.  Diedrich contends that its obligations under the ADA were contingent upon Magna meeting certain conditions. Those conditions included fulfilling the minimum development requirements and submitting copies of any agreement between Magna and the lessor of the new franchise location.  Magna did not fulfill either condition.  Nevertheless, the Court denies Diedrich's summary judgment motion on this claim.

The ADA did require Magna to fulfill all its obligations under the ADA before the ADA imposed any obligations on Diedrich.   Section 6.2, "Condition Precedent to Company's Obligations" stated:

> "It shall be a condition precedent to Company's obligations pursuant to Section 6.1, that Developer shall have performed all his obligations under and pursuant to all agreements between Developer and Company."

Obligations included compliance with the minimum development requirements, as well as a documentation requirement. Section 2.1.1 states:

> "Developer shall construct, equip, open and thereafter continue to operate at Venues within the Development Area not less than the cumulative number of Full Service Coffeehouses within each of the Development Periods specified in Exhibit "B")"

Exhibit B provides that Magna was to open a new franchise approximately once a year.  Section 6.1.1 states:

> "After Developer [Magna] has located a site for construction of a "Diedrich Coffee" Coffeehouse, **Developer shall submit to Company** such information regarding the proposed site as Company shall require, in the form which Company shall from time to time require, **together with a copy of an executed letter of intent** containing the terms of the proposed Lease for such site.  Company may seek such additional information as it deems necessary within 30 days after Developer's submission of the letter of intent and require site information, and Developer shall respond promptly, accurately and completely to such request for additional information."

Magna was not in compliance with the minimum development requirement.  Magna never opened a new Diedrich coffeehouse or kiosk.  The alleged preliminary agreement with the

University of Houston was not obtained until 2006.  However, Diedrich waived the minimum

development requirements in the 2004 Letter Agreement.  The Agreement states:

> *"The Company hereby waives its right to terminate the ADA for Magna Cum Latte's*
> *failure to adhere to such Minimum Development Obligations, while expressly reserving*
> *all of the Company's other rights under the ADA."*

Magna did not obtain or submit a copy of a letter of intent or other agreement between

Magna and the University of Houston.  However, Magna did not yet have a letter of intent to

submit to Diedrich.  Moreover, Magna submitted deposition testimony stating that Magna could

not obtain a letter of intent due to Diedrich's lack of cooperation.  Deposition testimony suggests

that the University of Houston would not enter a contract until they received a copy of Diedrich's

form franchise agreement and contact information for a Diedrich representative.   Magna

repeatedly requested a franchise agreement copy and contact information from Diedrich's

counsel.  Diedrich's counsel did not respond.

Based on the foregoing, Diedrich has not met its burden for summary judgment on

Magna's claim for breach of the ADA.

### iv. Barred Claims

Magna's complaint additionally asserts numerous claims[4] based on alleged

misrepresentations and omissions made by Diedrich while negotiating the franchise, sublease,

development, and purchase agreements.  Prior to Magna's purchase, Magna alleges that Diedrich

misrepresented sales growth, omitted expenses from the stores' financial statements, and assured

Magna that the Master Lease options would be exercised and that Diedrich would otherwise

honor its obligations under the agreements.

---

[4]  Specifically, common law fraud, fraud in a real estate transaction, fraudulent concealment, negligent
misrepresentation, tortious interference with a contractual relationship, and promissory estoppel.

The common law fraud, fraud in a real estate transaction, and fraudulent concealment claims are barred by the October 26, 2004 Letter Agreement. The Letter Agreement provided for mutual releases of all claims arising before execution of the Letter Agreement.[5] The above claims all arose prior to October 26, 2004. Magna admits as much with respect to the fraud claims.

The negligent misrepresentation, promissory estoppel, and tortiuous interference with a contractual relationship claims did not accrue until Diedrich decided to not exercise the Westheimer Store option. That decision was made in 2006, not 2004. Consequently, the Letter Agreement's release does not bar these claims. However, the negligent misrepresentation and promissory estoppel claims are based on allegations that Diedrich represented that it would exercise all the lease options. Magna has offered no objective evidence suggesting that Diedrich represented that Diedrich would exercise the lease options.

The Court grants Diedrich's summary judgment motion with respect to the common law fraud, fraud in a real estate transaction, fraudulent concealment, negligent misrepresentation, and promissory estoppel claims.

### v. Disparagement and Tortious Interference with Prospective Business Relationships

After Diedrich decided to not exercise the Westheimer Store option, Magna began negotiating a new lease directly with T-Con. Magna's complaint alleges that the negotiations were torpedoed when Diedrich disparaged Magna to T-Con. Specifically, Diedrich allegedly

---

[5] Specifically, the Letter Agreement provided: "MAGNA CUM LATTE, Dirk Jon Smith and Julie Smith hereby absolutely and forever releases and discharges COMPANY [Diedrich] and its predecessors and affiliates and their respective officers, directors, shareholders, agents, employees and their heirs, executors and representatives, successors and assigns (the "Diedrich Parties") from and against any and all Claims (defined below) arising out of or relating to any transaction or relationship with any of the Diedrich Parties from beginning of time until the date of this Release . . .", and "COMPANY [Diedrich], on behalf of itself and the other Diedrich Parties, hereby forever releases, remises and discharges, and forever holds harmless the Magna Cum Latte Parties from any and all Claims which any member of the Diedrich Parties had, has or may have against any member of the Magna Cum Latte Parties from the beginning of time until the date of this Release . . ."

disparaged Magna's financial condition, ability to perform under a new lease, and interest in entering a new lease. Based on these allegations, Magna seeks recovery under business disparagement and tortious interference with prospective business relationships theories. Diedrich request summary judgment on this claim.

Magna has not offered evidence sufficient to survive summary judgment on its disparagement and tortious interference with prospective business relationships claims. The claims are based on statements allegedly made by T-Con's counsel to Magna's counsel. Magna has not submitted affidavits or depositions of the attorneys alleged to have made or heard the statements. Magna has only submitted deposition testimony from Dirk Smith alleging that his attorney told him that the statements were made. Smith's statement is inadmissible hearsay. No other evidence has been offered to support their claims.

Magna also asserts that Diedrich intentionally interfered with its relationships with Rice University and the University of Houston. Magna alleges that Diedrich prevented Magna from developing coffee kiosks on the Rice University and University of Houston campuses by failing to provide Magna with the a copy of Diedrich's franchise form and a contact person.

To establish a tortious interference with prospective business relationships claim, "the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). Magna asserts that Diedrich interfered with its prospective relationship with Rice by stating and indicating through its conduct that it did not intend to issue any new franchises. Magna asserts that Diedrich interfered with its prospective relationship with the University of Houston by not providing a copy of Diedrich's form franchise agreement or a contact person. Neither act constitutes a tort against Rice University or the University of Houston.

18

The Court grants Diedrich's summary judgment motion with respect to the business disparagement and tortious interference with prospective business relationship claims.[6]

**B. Claims Against Comerica.**

Comerica financed Magna's purchase through an $819,000 Small Business Administration ("SBA") loan.  After the Westheimer Store closed, Magna was unable to make payments on the loan.  Comerica sued Magna, Chrie8, and Dirk and Julie Smith (the "Magna Defendants") for breach of promissory note and personal guarantees in state court.  Comerica seeks damages for the remaining principal owed on the note, accrued interest and penalties, and attorney's fees.  The Magna Defendants filed a Plea of Intervention and Cross Claims asserting four causes of action against Comerica: breach of fiduciary duty, negligence, negligent misrepresentation, and promissory estoppel.  The Magna Defendants removed the suit to this Court and consolidated the case with the Magna Defendants' adversary proceeding filed against Diedrich.  Comerica seeks summary judgment on its claim against the Magna Defendants and the four cross-claims the Magna Defendants asserted against Comerica.

The Magna Defendants assert that Comerica represented that Comerica would obtain 10-year lease assurances for the three stores.  No assurances were obtained.  Nevertheless, Comerica told the Magna Defendants that the loan was ready for execution.  Relying upon Comerica's prior representations with respect to the lease terms, Dirk Smith testified in deposition that he assumed the assurances were obtained based on Comerica's representation that Comerica was ready to provide the financing.  Based on the Magna Defendants' reliance upon Comerica's above representations, Magna asserted negligence, promissory estoppel, negligent misrepresentation, and breach of fiduciary duty claims against Comerica.

---

[6] Magna's complaint also raised a claim for wrongful termination of a franchise under the California Business and Professions Code.  The parties' summary judgment motions did not specifically address this claim.  The Court reserves judgment on the wrongful termination claim.

The Magna Defendants submitted faxes, an e-mail, deposition testimony, and affidavits from the Smiths allegedly supporting their claim.  One fax allegedly indicates that Comerica told Magna that the store leases must be for a period equal to the repayment period of Magna's promissory note.[7] The promissory note was for 10.25 years.  The second fax allegedly indicates that Comerica represented that it was negotiating with Diedrich to extend the lease terms.[8] Dirk Smith also submitted an affidavit and testified in deposition that he believed Comerica would obtain 10-year lease assurances.[9]

Comerica seeks summary judgment on the Magna Defendants' four claims and their breach of promissory note claim against the Magna Defendants.  Comerica's argument partly relies on a "no oral agreements" clause in the promissory note and personal guarantees and a "No Oral Agreements" Agreement signed by the Magna Defendants.

Paragraph 10(E) of the promissory note executed by Magna and Chrie8 states:

*"Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note."*

Paragraph 9(H) of Dirk and Julie Smith's Unconditional Guarantees states:

*"Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee."*

---

[7] The fax from Comerica's representative to Dirk Smith and Karen Crouch, Diedrich's Director of Franchise and Lease Administration, states: "The lease term must equal the term of the SBA loan – which will be 10.25 years, once closed".

[8] The fax from Comerica's representative to Dirk Smith and Karen Crouch states: "The terms on the Montrose and Clear Lake locations need to be extended to equal or exceed the term of the loan (Karen is working on these; word has it that the landlord will give a 5 year option on Clear Lake)".

[9] Specifically, Dirk Smith testified: "[M]y understanding when we were doing the process and Comerica was working directly with Diedrichs to make sure that these leases were—you know, they must be for the length of the loan and they had—you know, in order to move forward with this.  You know, Diedrichs agreed to all that and I—you know, it was my understanding they had all that and it was my understanding there was a form or, you know, something that Comerica had in order to move forward with the loan.  Thought they had something in their filed and that's what I was asking for.

"I was like, 'Look, you know, you guys worked on this.  You had to have it.  You said you had to have it in order to the—in order to fund this loan.  I need this.'"

The "No Oral Agreements" Agreement executed by all the Magna Defendants, states:

*"(1) The rights and obligations of the parties shall be determined solely from the written "Loan Agreement" (as such term is defined in Section 26.02(a)(2) of the Texas Business and Commerce Code) executed and delivered in connection with the Loan, and any oral agreements between or among the parties are superseded by and merged into the Loan Agreement.*

*(2) The Loan Agreement has not been and may not be varied by any oral agreements or discussions that have or may occur before, contemporaneously with, or subsequent thereto.*

*(3) The written Loan Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.* ***There are no unwritten oral agreements among the parties.****" (emphasis added).*

The "No Oral Agreements" Agreement also states that the agreements contained within are made "in connection with credit accommodations made by the Lender to the Borrower (the "Loan")."

The "no oral agreements" clause and Agreement do not preclude the Magna Defendants' four claims.  The clause and Agreement were made with respect to the contract (promissory note and guarantees) between the Magna Defendants and Comerica.  The clause and Agreement speak to the promissory note's "written terms" and the "credit accommodation" between Comerica and the Magna Defendants.  The clause and Agreement do not create a black hole of immunity that swallows any oral representations made, regardless of to whom or in relation to what.  The clause and agreement has a bounded scope and that boundary is drawn by the promissory note.  Of course, the "no oral agreements" provision precludes any claim that the alleged obligations with respect to the underlying leases arise out of any of the lending agreements between the parties.

The Magna Defendants' claims *are not* contract claims based on the promissory note.  The claims *do not* seek to alter any terms within the promissory note.  The negligence complaint

does not argue a term should take a particular meaning because of an oral agreement. The negligence claim assumes the note means what Comerica says it means.

The complaints *are* based on oral representations. However, the complaint does not seek recovery based on what the promissory note says or should say. The complaint seeks recovery based on conduct that occurred outside of the promissory note. The negligence complaint argues that Comerica made misrepresentations that caused the Magna Defendants to execute a promissory note they would not otherwise have executed.

The "no oral agreements" clauses and agreement do not preclude the Magna Defendants from asserting their claims, to the extent that the claims are separated from the lending agreements between the parties.

Comerica raises additional grounds for granting summary judgment on the Magna Defendants' four claims.

### i. Breach of Fiduciary Duty

Under Texas law, fiduciary obligations can arise from a formal fiduciary relationship or an informal special relationship. *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston[1st Dist.] 1996, no pet.). A formal fiduciary relationship arises when "a special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one placing confidence." *American Medical Intern., Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex. App.—Hous. [14 Dist.] 1991, no pet.) (citing *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 566 (Tex. App.— Dallas 1989, no pet.)). Subjective trust by one party is insufficient to create a formal fiduciary relationship. *Id.* Moreover, the parties must have a history of dealings that would justify one parties' reliance upon the other. *American Medical Intern., Inc.*, 821 S.W.2d at 339–40; *Gillium*, 778 S.W.2d at

566–68. An informal special relationship arises when one party to the contract has an unequal bargaining position. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). The borrower-lender relationship "is usually neither a fiduciary relationship nor a special relationship." *Farah*, 927 S.W.2d at 675. *See also Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962).

The Magna Defendants have produced no evidence supporting either a formal fiduciary relationship or an informal special relationship. The Magna Defendants rely primarily upon two faxes and Dirk Smith's affidavit. The faxes and affidavit indicate that Comerica represented to Smith that Magna needed to obtain 10-year lease terms before issuing the loan. The statements are not sufficient to create fiduciary obligations under Texas law. Magna and Comerica's relationship was simply that of a borrower and lender. Magna introduced no evidence that Magna and Comerica had a long-standing relationship. The Magna Defendants introduced no evidence that Comerica had an unequal bargaining position.

The Court grants Comerica's summary judgment motion with respect to the Magna Defendants' fiduciary duty claim.

### ii. Negligence, Negligent Misrepresentation and Promissory Estoppel

Comerica contends that the Magna Defendants can not assert a negligence claim because their claim, if any, is a contract rather than a tort claim. Based on this contract characterization, Comerica argues that the Magna Defendants' claim is precluded by the doctrine of estoppel by contract.

Comerica's contention is misplaced. Comerica's alleged negligence is related to the contract (promissory note) between Comerica and the Magna Defendants. If Comerica was not negligent in its negotiations with Diedrich, the Magna Defendants would not have signed the

23

promissory note.  However, under the Magna Defendants' theory, liability does not arise from obligations imposed by the promissory note (contract). Liability arises from an assumed duty to negotiate on the Magna Defendants' behalf (tort).

The Second Restatement of Torts recognizes tort liability for negligent performance of an undertaking voluntarily assumed. RESTATEMENT (SECOND) OF TORTS § 323. Texas courts have adopted § 323. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976); *Peterson v. Mutual Sav. Inst.*, 646 S.W.2d 327, 329 (Tex. App. — Austin [3 dist.] 1983, no pet.).  A duty to carry-out a voluntary undertaking with reasonable care arises when one undertakes "to perform a service to the latter, either for consideration or gratuitously, when the former should recognize the service as being necessary for the protection of the latter's person or property." *Peterson*, 646 S.W.2d at 329. The duty and consequent liability can be imposed for purely economic injuries. *Id.* However, the undertaking must be "pursued for the benefit of the injured person and the injured person has suffered injury not from the negligence alone but from his reliance upon the undertaking. *Id.* (citing *Colonial Savings Association*, 544 S.W.2d at 119–20).

Negligent Misrepresentation has four elements: "(1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation." *Airborne Freight Corp., Inc. v. C.R. Lee Enterprises*, 847 S.W.2d 289, 294 (Tex. App.—El Paso 1992, pet. denied) (citing *Federal Land Bank Association of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

24

Promissory estoppel is a cause of action available to a "promisee who relied to his detriment on an otherwise unenforceable promise." *Frost Crushed Stone Co., Inc. v. Odell Geer Const. Co., Inc.*, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.) (citing *Wheeler v. White*, 398 S.W.2d 93, 96–97 (Tex. 1965)).   The elements are: "(1) a promise; (2) forseeability of reliance thereon by the promisor; and (3) substantial reliance by the promise to his detriment. *Id.*

The primary evidence in support of the plaintiff's theories of negligence, negligent misrepresentation, and promissory estoppel are the two faxes.   The deposition testimony, e-mails, and the Smiths' affidavits reiterate the same point made by the faxes: that Comerica initially wanted ten-year lease terms and communicated with Diedrich with respect to the lease terms.   The affidavits rely largely on the two faxes and e-mails.   To the extent that the deposition testimony goes beyond the contents of the faxes and e-mails, it contains assumptions made by the Smiths.   The Smiths' assumptions are not evidence of any undertaking or duty to Comerica. At best, they support the reliance element of their claims.   However, the assumptions by the Smiths fail to support any of the other necessary elements of these claims.   As a matter of law, the two faxes and assumptions are insufficient to establish any of the three theories.   Summary judgment is appropriate.

### iii. Breach of Promissory Note

Summary Judgment is appropriate for Comerica's claim of breach of promissory note and guarantees.   Magna is in default under the note.   The default triggers the guarantor's current obligation to pay.   The defenses have all been denied on summary judgment.   Comerica submitted an affidavit setting forth the principal ($507,059.76), past due interest ($57,526.97) and late fees and charges ($6,869.28) due under the note as of August 14, 2007, and interest accruing from August 14 until the date Judgment is issued ($142.39 per day) ($8,116.23 for 57

25

days spanning August 14 through October 10).   The promissory note also provides for reimbursement of Comerica's reasonable attorneys' fees and expenses.   Comerica submitted an affidavit setting forth the attorneys' fees ($53,720.33) and expenses ($9,163.83) incurred in relation to the note ($62,884.16).   The Magna Defendants did not challenge the amounts alleged due in the affidavits.

The Court grants Comerica's motion for summary judgment with respect to the claim of breach of promissory note and guarantees.   Accordingly, for amounts owed under the note through March 12, 2007 (the date Magna filed for bankruptcy), Comerica has a $549,915.75 claim against Magna in Magna's bankruptcy case.   Chrie8, Inc., and Dirk and Julie Smith are jointly and severally liable to Comerica on the note in the amount of $642,456.40 for amounts owed through October 10, 2007.   The $642,456.40 judgment shall bear the 4.12% federal post-judgment interest rate mandated by 28 U.S.C. § 1961.

### New Matter in Motion for Reconsideration

In their motion for reconsideration, the Magna Defendants raise a new defense to the personal guarantees.   The Magna Defendants assert that a guarantor is discharged from his personal guarantee if the underlying debt is materially altered.   The Magna Defendants assert that Comerica altered the sublease terms after the promissory note and personal guarantees were executed.   The defense is without merit.   There is no evidence that any agreement was altered. At best, the summary judgment evidence supports a theory that the terms of the leases were not what the Magna Defendants expected them to be.

**Conclusion**

For the reasons set forth above, the Court denies Magna's summary judgment motion, denies in part and grants in part Diedrich's summary judgment motion, and grants Comerica's summary judgment motion.  Separate orders will be issued.

Signed at Houston, Texas, on October 30, 2007.

MARVIN ISGUR
United States Bankruptcy Judge