

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
12/17/2007

| | | |
|---|---|---|
| IN RE: | § | |
| **MAGNA CUM LATTE, INC.,** | § | **CASE NO: 07-31814** |
| Debtor | § | |
| | § | **CHAPTER 11** |
| | § | |
| **MAGNA CUM LATTE, INC.,** | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 07-03304** |
| | § | |
| **DIEDRICH COFFEE, INC.,** *et al* | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

### Background

The present dispute arises from the purchase of three coffee franchises.

Defendant Diedrich Coffee, Inc. ("Diedrich") is a California-based coffee business that operated coffeehouses and sold Diedrich franchises. Diedrich owned four coffeehouses in Houston, Texas. Dirk J. Smith ("Smith") formed plaintiff Magna Cum Latte, Inc. ("Magna") to purchase the Houston coffeehouses and Chrie8, Inc. ("Chrie8") to manage Magna. Smith is the sole shareholder of both Magna and Chrie8. On May 9, 2001, Magna and Diedrich executed franchise, sublease, and purchase agreements with respect to three of the Houston coffeehouses (the "Westheimer Store," "Montrose Store," and "Clear Lake Store"). Diedrich closed the fourth. The parties also executed an Area Development Agreement ("ADA") that granted Magna rights to develop additional Diedrich coffeehouses and kiosks within the Houston area.[1] Magna paid $1,025,000 for the franchise, lease, and development rights. Comerica Bank ("Comerica") provided an $819,000 loan to finance the purchase.

---

[1] The ADA gave Magna the exclusive right to develop Diedrich coffeehouses in the Houston area and a non-exclusive right to develop Diedrich kiosks on the University of Houston campus and near the Clear Lake Store.

Two aspects of the sublease agreements quickly sparked contention: renewal options and a "rent formula" used to determine Magna's rent.  Under Diedrich's Master Leases, the stores' initial lease terms expired in 2001, 2002, and 2004.  Diedrich held one or two five-year options on each store.[2] Diedrich's Master Leases did not require Diedrich to exercise the options. Magna's sublease agreements with Diedrich stated that the sublease terms lasted for ten years or the termination or expiration of Diedrich's Master Leases.  The subleases did not expressly require Diedrich to exercise the options or specify under what, if any, conditions Diedrich could decline the options.  The subleases also provided that Magna's payments would be based, in part, on a percentage of gross sales.  However, sales never met projections.  Consequently, Diedrich's obligations under its Master Leases exceeded Magna's obligations under the subleases.  In early 2004, Diedrich's situation worsened when its rent for the Montrose Store increased by $1,000 per month.  From 2003 until the Westheimer Store's closure in 2006, Diedrich repeatedly requested Magna to renegotiate the subleases and threatened to let the stores' renewal options expire if sublease amendments were not obtained.  Smith contended that the agreements obligated Diedrich to exercise the options.

The ADA also created tension.  The ADA contained a "minimum development obligation" that required Magna to open approximately one new coffeehouse per year.  Magna failed to open any new Diedrich franchises.

On October 26, 2004, Magna and Diedrich sought to resolve their disputes by a Letter Agreement.  The Letter Agreement extended Magna's development rights through May of 2006, instituted a new royalty structure, and contained mutual releases from claims arising prior to the

---

[2] The stores had the following terms:
- Westheimer Store: lease expired November 7, 2001, with two five-year options.
- Montrose Store: lease expired on August 31, 2004, with one five-year option.
- Clear Lake Store: lease expired on July 20, 2002, with one five-year option.

Letter Agreement.  The Letter Agreement also waived Diedrich's right to terminate the ADA based on Magna's failure to meet the minimum development requirements.

Unfortunately, the Letter Agreement did not save Magna and Diedrich's commercial relationship.  In 2005 and 2006, Magna began negotiations with the University of Houston to establish a kiosk on campus.  However, an agreement was not obtained.  Magna blamed the negotiation's demise on Diedrich's failure to provide information the University requested.

In May of 2006, Diedrich did not exercise the Westheimer Store option.  Magna attempted to negotiate a new lease directly with the Westheimer Store's landlord, T-Con Properties, Ltd. ("T-Con").  However, Magna and T-Con were unable to reach an agreement. The Westheimer Store closed and Magna defaulted on its obligations to Diedrich.  Magna filed a chapter 11 bankruptcy petition on March 12, 2007.

On June 26, 2007, Magna filed this adversary proceeding against Diedrich.  Magna's complaint alleged that Diedrich violated express provisions of their agreements and engaged in bad-faith conduct that doomed Magna's business.  Magna asserted twelve causes of action.[3] Magna seeks lost profits and other damages exceeding $12,000,000.

On April 17, 2007, Comerica filed a suit against Magna, Chrie8 and Dirk and Julie Smith (the "Magna Defendants") in state court.  Comerica's complaint sought judgment for the unpaid balance of the $819,000 note plus accrued interest and attorney's fees. The Magna Defendants filed a Plea of Intervention and Cross Claims asserting four claims against Comerica.  The lawsuit was removed to this Court and consolidated with the adversary proceeding filed by Magna.

---

[3] Specifically, Magna asserted: breach of contract (express terms), breach of the implied covenant of good faith and fair dealing, common law fraud, fraud in a real estate transaction, fraudulent concealment, wrongful termination, tortious interference with contractual relationship, tortious interference with prospective business relationships, business disparagement, negligent misrepresentation, promissory estoppel, and detrimental reliance.

On July 20, 2007, Magna filed a partial summary judgment motion for breach of contract and breach of the implied covenant of good faith.  On August 29, 2007, Diedrich filed a summary judgment motion on all twelve causes of action.  On August 30, 2007, Comerica filed a summary judgment motion for its breach of promissory note and personal guarantee claims, and the Magna Defendants' four claims.

On October 30, 2007, this Court issued its Amended Memorandum Opinion on the summary judgment motions.  The Court denied the Magna Defendants' summary judgment motion against Comerica and granted judgment for Comerica on all claims.  The Court denied Magna's summary judgment motion against Diedrich.  The Court granted Diedrich's summary judgment motion on all claims except: breach of the implied covenant of good faith and fair dealing, breach of the ADA, and wrongful termination under the California Business Code.

On November 6th and 7th, 2007, Magna and Diedrich submitted evidence on Magna's three remaining claims.  The Court holds for Diedrich on Magna's ADA claim.  The Court holds for Magna on the implied covenant and wrongful termination claims.

## Jurisdiction and Venue

This Court has jurisdiction of this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. §1409.

## Analysis

The Court considers Magna's three claims separately.

### i. Breach of the Implied Covenant of Good Faith and Fair Dealing.

All parties agree that California law governs the dispute.  Both the franchise and purchase agreements contain choice of law provisions providing that the agreements shall be governed by California law.

The party asserting breach of the implied covenant bears the burden of proving the claim by a preponderance of the evidence. *Pugh v. See's Candies Inc.*, 203 Cal. App. 3d 743, 760 (Cal. App. 1st D. 1988); 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2007).

California law imputes an implied covenant of good faith and fair dealing within all contracts, including franchise agreements. *In re Vylene Enterprises, Inc.* 90 F.3d 1472, 1477 (9th Cir. 1996) (citing *Harm v. Frasher*, 181 Cal App.2d 405, 417 (Cal App. 4 Dist. 1960)); *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co. of Cal.*, 36 Cal. 3d 752, 768 (Cal. 1984) (overruled on other grounds); *Sutherland v. Barclays Am./Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (Cal. App. 2 Dist. 1997); *Dayton Time Lock Serv., Inc. v. Silent Watchman*, 52 Cal. App. 3d 1 (Cal. App. 2 Dist. 1975). The covenant applies to a contract's performance and enforcement. REST. (SECOND) OF CONTRACTS §205 (1981). Generally, "the covenant imposes a duty upon a party to a contract not to deprive the other party of the benefits of the contract." *Sutherland*, 53 Cal. App. 4th at 314. The "scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers, Inc. v. Marathon Dev. Ca., Inc.,* 2 Cal. 4th 342, 373 (Cal. 1992). The covenant can not *contradict* express contractual provisions or *create* new obligations. *Racine & Laramie, Ltd. v. Dept. of Parks & Recreation*, 11 Cal. App. 4th, 1026, 1032 (Cal. App. 4. Dist.1992). The covenant can not forbid what a contract expressly allows or allow what a contract expressly forbids. *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 366 (Cal. App. 3 Dist. 1997) ("As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct").

However, the implied covenant of good faith and fair dealing is not limited to the contract's expressed terms. *Carma Developers, Inc.* 2 Cal.4th at 373 (Cal. 1992) ("breach of a

specific provision of the contract is not a necessary prerequisite"). An implied covenant would imply nothing if it was limited to rights and obligations expressly provided in the contract.

The covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers, Inc.* 2 Cal.4th at 371. If a contract gives a party discretion to act, rather than expressly allowing or disallowing action, the implied covenant applies. *Id.* at 363 ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.") (citing *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 923 (Cal. 1985)). The covenant limits the exercise of discretion to purposes "within the reasonable contemplation of the parties at the time of [contract] formation." *Id*. at 372 (quoting BURTON, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 373 (1980).  Discretion should not be used to seize benefits that were not bargained for during contract formation. *Id.*

The Second Restatement of Contracts provides an example that illustrates the implied covenant's application:

> "A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket.  Unless such action was contemplated or is otherwise justified, there is a breach of contract by A."

§205 (1981). The contract's express terms *did not* state that B's exclusive right would extend to centers not then in existence.   Nevertheless, the implied covenant informs the contractual language so that it conforms to what the parties, bounded by norms of good faith and fair-dealing, contemplated.  *See also Vylene Enterprises, Inc.* 90 F.3d at 1472 (holding that a

6

franchisor violated the implied covenant by opening a competing franchise near an existing franchise despite the fact that the franchisee's contract did not provide for an exclusive territory).

Breach of the implied covenant requires more than mere negligent or mistaken conduct. Breach of the implied covenant requires "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Sec. Pac. Bus. Credit*, 222 Cal. App. 3d 1371, 1395 (Cal. App. 2 Dist. 1990); *Congleton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 189 Cal. App. 3d 51, 59 (Cal. App. 2 Dist. 1987) ("bad faith implies unfair dealing rather than mistaken judgment . . .") (quoting *Cal. Shoppers, Inc. v. Royal Globe Ins. Co*, 175 Cal. App. 3d 1, 55 (Cal. App. 4th Dist. 1985)); *Sawyer v. Bank of Am.*, 83 Cal. App. 3d 135, 139 (Cal. App. 3rd Dist. 1978) (breach of the implied covenant requires "bad faith action, extraneous to the contract, with the motive intentionally to frustrate the [other party]'s enjoyment of contract rights.").

Ultimately, implied covenant law requires the Court to complete the interstices of the contract. *Market Street Assoc.'s Ltd. P'ship v Frey*, 941 F.2d 588, 595 (7th Cir. 1991). When the contract fails to consider all of the possibilities that might arise, the Court must determine what the parties would have agreed in their original negotiations if the parties had considered the issue and fully negotiated the terms of the contract. *Id.* at 596. The heart of the dispute between these parties concerns an unexpected eventuality—although the parties contemplated a 10-year agreement, the franchised coffeehouses underperformed their expectations. Magna was unable to negotiate direct leases with the landlords and Diedrich unexpectedly desired not to exercise its renewal options on the leases. For the reasons set forth below, the Court holds that Diedrich was

not free to act on its desires but was required to exercise its lease options.   Based on the credibility of the witnesses and evidence presented, the Court holds that Diedrich violated the implied covenant.

### 1. The Westheimer Store Lease.

The Court has held that Diedrich's failure to exercise the Westheimer Store option did not breach an express contract provision. 2007 WL 3231633, Case No. 07-31814, Adv. No. 07-03304 (Bankr. S.D. Tex. Oct. 30, 2007)**.**  The Court noted that the agreements are "silent as to whether Diedrich could decline to exercise the lease options.   The decision to exercise the options was left to Diedrich's discretion." *Id.* at *7.[4]  Diedrich's Master Leases contained options on each store.   Under the Master Leases, Diedrich held a discretionary right to exercise the options.   Magna's sublease agreements with Diedrich were silent with respect to the options. The sublease agreements' provisions defining the subleases' terms merely incorporated the Master Leases' terms.   There was no mention of the options.   The subleases stated that the terms matched the Master Leases' terms.   The Master Leases' terms extended for the initial lease terms plus any options that Diedrich, in its discretion, chose to exercise.[5]

---

[4] In its summary judgment motions, Diedrich contended that a "No Other Obligations" clause in the franchise agreements expressly allowed Diedrich to refrain from exercising the Westheimer Store option.   That provision states: "Company shall not be obligated to provide any services to Franchisee except expressly provided herein and any and all other services which Company may provide to Franchisee during the Term shall be at its sole discretion and Company may cease to provide the same without notice of further obligation to Franchisee." However, the clause is within the Franchise Agreement, not the Sublease Agreement.   Moreover, exercising a lease option can not be considered a "service" under the Franchise Agreement's "No Other Obligations" clause.   The "No Other Obligations" clause follows clauses explaining the "services" Diedrich is obligated to provide franchisees.   Those "services" include training, advertising, and supplying franchises with training, store designs, and coffeehouse supplies.   In other words, the clause speaks to the tangible assistance Diedrich agrees to provide franchisees.   The discretionary decision to exercise a lease option is not a "service" according to the meaning given by the franchise agreements' provisions or ordinary English usage.

[5] Because the parties' contracts did not contain a provision defining how Diedrich could exercise its discretion, the Court finds that its decision is not in conflict with the parol evidence rule.   "The parol evidence rule precludes consideration of extrinsic evidence to contradict, vary or add to the terms of an unambiguous written agreement absent fraud, accident or mistake." *In re H.E. Butt Grocery Store Co.*, 17 S.W.3d 360, 369 (Tex. App.—Houston[14th Dist.] 2000). Here, the court is not using parol evidence to interpret or vary a contract provision.   The

The question presented then is whether Diedrich exercised its discretion consistent with the implied covenant of good faith. The implied covenant applies to discretionary decisions. *Carma*, 2 Cal. 4th at 372 ("The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another."). The party holding the discretionary power must exercise that discretion in good faith. *Carma*, 2 Cal. 4th at 372 (discretionary power "must be exercised in good faith.")

In reference to Wisconsin courts' use of the implied covenant, Judge Posner noted that the "cases are cryptic as to its meaning though emphatic about its existence." *Market Street Assoc.'s Ltd. P'ship v Frey*, 941 F.2d 588, 593 (7th Cir. 1991). This court finds the same to be true of California cases. The California Supreme Court has itself noted that "defining what is required by this covenant has not always proven an easy task." *Id*. Nevertheless, the California Supreme Court has adopted a standard that focuses on the parties' reasonable contemplations at the time of contract formation. *Id*. at 372–374 (citing BURTON, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 373 (1980)); *Badie v. Bank of America*, 67 Cal. App. 4th 779, 796 (Cal. App. 4th 1 Dist. 1988); *Sutherland*, 53 Cal. App. 4th at 314. *See also Market Street Associates Ltd. P'ship*, 941 at 594 (applying the same standard under Wisconsin Law). A party may exercise discretionary power only in a manner that would have been within the parties' reasonable contemplations at the time of contract formation. *Id*.

*a. The Parties Contemplations.*

---

parties did not draft a provision defining under what circumstances Diedrich was obligated to exercise the options. The Court has stated in a previous opinion that the contracts were silent as to the options. The court is considering parol evidence to evaluate a party's *conduct* to determine whether the *conduct* conformed with the implied covenants' requirement that contracts be performed in good faith. Application of the implied covenant simply enforces the implied good faith standards incorporated in all contracts.

At the time of contract formation, the parties contemplated that Diedrich would exercise the options in the circumstances presented: specifically, where Diedrich had not obtained his own lease directly with the landlord.

The Court finds that the parties *did not* contemplate that Diedrich would be *absolutely required* to exercise the lease options.  Mathew McGuinness (Diedrich's former Chief Financial Officer), Karen Crouch (Diedrich's former director of franchise and lease administration and present Diedrich employee), and Smith, all testified that Magna and Diedrich intended for Smith to ultimately lease the properties directly from the landlords.  McGuinness, Crouch, and Steve Coffee (Diedrich's present Chief Executive Officer) testified that Diedrich had no interest in remaining on the leases.  Diedrich was in the business of selling coffee, not real estate.  Indeed, Diedrich was losing money on the leases.  McGuinness, Crouch, and Smith also consistently testified that Dirk hoped to negotiate new leases directly with the landlords.  Testimonial and documentary evidence indicated that Smith thought Diedrich was making money off the subleases and that he could obtain a lower rent if he could lease directly from the landlords.  E-mail communications between Smith and Diedrich employees confirm that all parties intended for Smith to ultimately lease premises directly from the landlords.[6]

However, the Court finds that the parties *did* contemplate that Diedrich would exercise the Westheimer Store option under the circumstances presented.  After examining the evidence submitted, there is no question in the Court's mind that the parties intended a relationship with a 10-year or longer life and that Diedrich would exercise the options if exercise was necessary to preserve the relationship.  The options existed for a purpose.  The contemplated purpose of the options was to allow Magna to remain on the leased premises if Smith was unable to negotiate

---

[6] Smith was unable to obtain leases directly with the landlords.  Testimony suggested that the landlords preferred that Diedrich, the more credit-worthy and established entity, remain the direct leaseholder.

his own leases directly with the landlords.  Everyone hoped Smith would be able to lease directly from the landlords.  However, if Smith was unable to obtain a direct lease, all parties (including Smith's lender) wanted Smith in the stores.  Diedrich needed Smith to remain in the locations to protect its investments in the stores, avoid having to take over the stores, and to have any hope of making money on the franchises.  Smith, of course, needed the leases to survive.  The Westheimer Store was by-far Magna's most profitable store.  Smith had not obtained a new lease directly with the landlord prior to the option's expiration.  Diedrich knew the importance of the Westheimer Store.  Smith sent multiple letters expressly stating that Magna was depending on Diedrich fulfilling its obligation to exercise the option.

The testimony and documents admitted at trial clarify that Magna and Diedrich intended that Diedrich would exercise the options if Magna was unable to obtain his own leases directly with the landlords.  Most telling is a March 12, 2001 Confidential Letter of Understanding Diedrich sent to Magna.  The letter outlines the parties understanding of their agreements.  The letter begins by stating: "This letter is to set forth our mutual understanding of the terms and conditions we have discussed . . .".  Paragraph 8 states: "Exhibit B reflects the sublease terms and rent amount for each property."  Exhibit B *does not* list the Master Leases' terms without the option periods.  Rather, Exhibit B lists the then current lease terms *and* the 5- year options.  The letter unambiguously states that Magna's sublease includes the options.  The uncontested testimony was that the letter agreement properly reflected the parties' contemplations at the time of contract execution.

Karen Crouch's testimony was equally telling.  Crouch testified that the franchise agreement was intended to be for ten years *unless* Smith obtained a lease directly with the landlord that was for less than 10 years.  The franchise agreement stated that the term of the

agreement shall be "10 years, or unless the term of the Franchisee's lease for the premises, if any, is for less than ten (10) years, including any option periods contained in said lease which are exercised by Franchisee, in which event the franchise shall be for a term identical to the term of Franchisee's lease."  Crouch testified that the "Franchisee's lease" was intended to refer to any lease Smith was able to negotiate directly with a landlord.  Consequently, the exception to the ten years would only be triggered by Smith obtaining a direct lease for less than ten years.  In the absence of the contingency, the deal approximated ten years only if Diedrich exercised the options.

Diedrich's exercise of the Montrose Store option and the purchase price paid for the agreements further evidence the parties' intent.  As the Montrose Store option neared its expiration, Diedrich repeatedly represented that it would not exercise the option if Magna refused to negotiate a sublease amendment.  Magna refused to sign a sublease amendment. Nevertheless, Diedrich exercised the Montrose Store option.  Additionally, Magna paid $1,025,000 and obtained over $800,000 in financing for the franchise and sublease rights.  If Diedrich did not have an express or implied obligation to exercise the options, Magna's leases would have expired in 2001, 2002, and 2004.  Under the franchise agreements' terms, the franchise agreements expired upon expiration of the leases.  Dirk Smith testified that Magna, through Smith, would have never agreed to pay $1,025,000 for rights that could be terminated within months of the purchase.  The Court finds that Smith would not have paid $1,025,000 without reasonably contemplating that options would be exercised if he did not obtain his own leases, and Diedrich would not have reasonably expected to receive $1,025,000 without contemplating the same.  Magna may have acquired the options with the private intention of

exercising the options only if it was in their financial interests.  However, contracting parties are bound by outward expressions of intent.[7]

The Court finds Judge Posner's analysis of an implied covenant claim in *Market Street Associates* insightful.  *Market Street Assoc.'s Ltd. Partnership v. Frey*, 941 F.2d 588 (7th Cir. 1991).  *Market Street* also involved a dispute arising from a lease. *Id*. at 589. Market Street had a lease agreement with General Electric Pension Trust that granted Market Street an option to purchase the leased property at a predetermined price if General Electric refused to finance improvements on the leased premises. *Id*. at 591. Years after entering the lease agreement, the market value of the property far exceeded the option price. *Id*. at 592. Market Street requested financing for improvements, without citing the option lease provision or otherwise reminding General Electric of the consequences of declining financing. *Id*. at 591–92. General Electric refused the financing. *Id*. at 592. Market Street attempted to exercise the option. *Id*. General Electric refused and Market Street brought suit for specific performance. *Id*. Judge Posner, writing for the 7th Circuit, noted that Market Street did not violate an express provision of the parties' contract. *Id*. at 593.  Nevertheless, the 7th Circuit held that Mark Street's conduct might have[8] violated the implied covenant of good faith.  Judge Posner wrote:

> [C]ontracts do not just allocate risk. They also (or some of them) set in motion a cooperative enterprise, which may to some extent place one party at the other's mercy . . . The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule.

*Id*. at 595.  Judge Posner continued:

---

[7] Diedrich was losing money on the leases, and certainly no reasonably party enters a contract intending to voluntarily continue a known stream of income loss.  However, no contract is guaranteed.  All parties must contemplate that their commercial ventures may fail.

[8] The Seventh Circuit actually reversed a summary judgment issued by the trial court in General Electric's favor. However, the case was remanded for trial to determine whether there had been a covenant breach.

On this interpretation of the facts there was no bad faith on the part of Market Street Associates. It acted honestly, reasonably, without ulterior motive, in the face of circumstances as they actually and reasonably appeared to it. The fault was the pension trust's incredible inattention, which misled Market Street Associates into believing that the pension trust had no interest in financing the improvements regardless of the purchase option. We do not usually excuse contracting parties from failing to read and understand the contents of their contract; and in the end what this case comes down to—or so at least it can be strongly argued—is that an immensely sophisticated enterprise simply failed to read the contract. On the other hand, such enterprises make mistakes just like the rest of us, and deliberately to take advantage of your contracting partner's mistake during the performance stage (for we are not talking about taking advantage of superior knowledge at the formation stage) is a breach of good faith. To be able to correct your contract partner's mistake at zero cost to yourself, and decide not to do so, is a species of opportunistic behavior that the parties would have expressly forbidden in the contract had they foreseen it. The immensely long term of the lease amplified the possibility of errors but did not license either party to take advantage of them.

*Id*. at 597.

Declining the Westheimer Store option under the circumstances presented was not within the parties' reasonable contemplations. Consequently, Diedrich's decision to decline the option breached the covenants implied in the parties' contractual relationship.

### b. Notice and Offer.

Diedrich contends that it did not violate the implied covenant because it gave Magna ample notice of its intention to decline the Westheimer Store option and made a good-faith offer to exercise the option if Magna would agree to a sublease amendment. Diedrich's contentions are misplaced. The reasonableness of any notice or counteroffer is irrelevant. If the implied covenant precluded Diedrich from declining the option, Diedrich can not escape the implied covenant's demands by violating the covenant with velvet gloves. The implied covenant required Diedrich to exercise the options in the circumstances presented.

Nor does the Court find that Diedrich's notice and offer were made in good faith.  Karen Crouch testified that Diedrich decided to decline the Westheimer Store option as early as 2004.[9] On January 4, 2006, Diedrich sent Smith a letter stating that "Diedrich does not have any intention of extending the term of the Master Lease with the Landlord for this location after the expiration date."  The letter also informed Smith that if he wished to continue operating the Westheimer Store, he should "contact the Landlord to discuss a new lease (directly with the Landlord) as soon as possible and advise Diedrich of the progress of such negotiations."  On March 31, 2006, Smith responded via letter, stating that Diedrich had agreed to maintain the leases for 10 years, Diedrich and not Magna had created the rent formula, and Magna intended to hold Diedrich to these agreements.  On April 12, 2006, Diedrich responded to Magna's March letter, stating that Diedrich did not have a contractual obligation to exercise the option, but that Diedrich would exercise a new franchise agreement if Magna was able to negotiate a new lease directly with the landlord.  On April 28, 2006, Smith responded, restating his belief that Diedrich was obligated to maintain the lease.

Approximately one week before the option expired, Diedrich offered to exercise the option if Magna would agree to a sublease amendment.  Diedrich's right to exercise its second five-year option expired on May 5th, 2006.  Diedrich's attorney responded to Smith's April 28th letter the same day, repeating Diedrich's belief that it had no obligation to exercise the option.  However, Diedrich offered to exercise the option if Magna would agree to a new sublease by

---

[9] As early as 2004, Diedrich at least indicated that it would decline the option.  In November of 2004, Diedrich sent Magna a proposed Letter Agreement stating that Diedrich did not believe it was required to exercise the options, and that Diedrich would not exercise future options unless Magna agreed to various sublease amendments.  Magna did not sign the agreement, believing Diedrich was obligated to exercise the options.  Diedrich's letter came approximately one week after Magna executed a Letter Agreement releasing all claims against Magna.  Smith contends that Diedrich did not inform him of Diedrich's intent to not exercise the options absent a sublease amendment during negotiations for the October 2004 Letter Agreement.  Additionally, Diedrich gave Smith one day to respond to the proposed November Letter Agreement.  Diedrich did not express an intent to decline the Westheimer Store option again until the January 2006 letter.

which Magna would pay 100% of the rent owed under the Master Lease and a two month security deposit. The new rent-arrangement would increase Magna's rent by approximately $1,000 per month. The letter also stated that Smith had to respond by May 4th. On May 3rd, Smith responded, repeating that Diedrich was obliged to exercise the options.

The offer was not made in good faith. The offer required Magna to cede the contracted-for rent-formulas that determined Magna's rent on the subleases. The sublease applied the rent-formula to the option periods. Article 4.1 provided: "Commencing on the Date of Possession and on the first day of each calendar <u>month</u> thereafter during the **term** hereof, Sublessee shall pay to Sublessor:" a base rent plus a percentage of gross sales (the rent formula) (emphasis added). The term is matched to the Master Lease's term. Article 2 defines the sublease term: "The term of this Sublease shall be for that period, commencing on the Date of Possession and terminating upon the sooner of (i) ten (10) years, (ii) the termination or expiration of the Master Lease, or (iii) the termination for any cause whatsoever of the Franchise Agreement." The Master Lease did not terminate when the options became due. Rather, the Master Lease continued until the options expired. Consequently, the rent-formula applied through the term of the Master Lease, which included periods covered by exercised options. The rent-formulas may not have produced the income Diedrich hoped. Nevertheless, the rent-formulas were express contractual provisions that applied to the options. Any offer to exercise an option contingent upon Magna agreeing to pay a greater rent was simply a demand on Magna to release a contractual right before it would honor an obligation that the implied covenant required Diedrich to fulfill.

Diedrich also contends that it did not violate the implied covenant because Magna had decided to negotiate directly with the Westheimer Store landlord. However, these negotiations occurred only after Diedrich's option expired on May 5th. Smith did not choose to negotiate

with T-Con in lieu of negotiating with Diedrich.  Smith negotiated with T-Con because direct negotiation with T-Con was Magna's only hope of retaining the Westheimer Store after Diedrich decided to let the option expire.  Smith told Diedrich of these negotiations, and requested and obtained a letter from Dierdich stating that Diedrich did not intend to exercise the lease option. Smith testified that he needed the letter before T-Con would agree to negotiate directly with him. However, the letter was issued on May 11, after the option expired.  Unfortunately for Smith, T-Con declined to lease the premises to Smith.

Diedrich's decision to let the Westheimer Store option expire was not based on mere negligence or mistake.  Diedrich made a conscious decision inspired by their pecuniary interests. Diedrich was losing money on the leases.  Magna's stores were not producing royalty profits in-line with Diedrich's expectations.  Magna's stores were the last hold-outs of a failed franchising plan Diedrich was abandoning.  Nevertheless, conduct based on one's own pecuniary interest is not generally considered bad-faith.  Self-interest drives commerce.  However, conduct that breaches a duty implied by the covenant of good faith and fair dealing is not excused because the conduct is self-interested.

### c. Magna's Breach.

Further complication is added to the implied covenant inquiry by the fact that Smith breached the implied covenant prior to Diedrich's breach.

Early in 2004, Smith and Diedrich discussed amendments to the Montrose Store sublease. Diedrich's rent under the Master Lease was due to increase by approximately $1,000 per month and Diedrich hoped to pass on a portion of the increase to Magna.  Smith admitted that he agreed to consider a sublease amendment.  However, Smith wanted concessions, including restructuring of royalty and advertising fees, and an additional two-year option on the Montrose Store

17

location.   Diedrich ultimately signed the Montrose Store option, based, in part, on Smith's representation that he would negotiate a sublease amendment.[10]

Diedrich exercised the option and made concessions on royalties and advertising fees. Smith never signed a sublease amendment.  Smith contended that Diedrich never addressed the two-year shortfall.  However, the two-year option demand was unreasonable.  Diedrich had no authority to demand an additional two-year option from the landlord.  Diedrich did not own the leased premises.  Nor did Diedrich have a contractual obligation to obtain an additional two-year option.  The lease and option terms were stated in the parties' contracts.  The lease and option periods for the Montrose Store spanned eight years.  Nothing in the contracts required Diedrich to acquire additional option periods.

Conditioning an agreement on a condition the other party has no authority or obligation to fulfill does not constitute good faith negotiation.  Smith had no intention of negotiating an amendment to the Montrose Store sublease.  Smith misrepresented his intention to negotiate the Montrose Store sublease so that Diedrich would execute the option.  Regardless of whether Diedrich should have exercised the option, a party can not enforce obligations or accomplish ends through material misrepresentations.  Smith's misrepresentations breached the implied covenant of good faith.

Nevertheless, Smith's 2004 breach of the implied covenant with respect to the Montrose Store does not excuse Diedrich's breach in 2006 with respect to the Westheimer Store.

Following the Montrose Store negotiations, the parties exercised a Letter Agreement in October of 2004.   The Letter Agreement included a mutual release provision releasing both

---

[10]  For the reasons set forth in this opinion, we find that Magna correctly demanded that Diedrich exercise the option on the Montrose Store.  Nevertheless, there was a bona fide dispute between the parties.  It was resolved by agreement.  Magna had no right to breach its settlement arrangement with Diedrich.

parties of any claims that arose prior to the Letter Agreement.[11]   Any right Diedrich may have had to terminate the contract based on the Montrose Store negotiations was waived by the mutual release.   The obligations, including the implied covenant of good faith, remained binding on Diedrich when Diedrich chose to decline the Westheimer Store option.

### 2. Other Conduct.

#### a. Omissions and Misrepresentations.

Magna also asserts that Diedrich violated the implied covenant through alleged misrepresentations, omissions, threats, and business decisions made throughout Diedrich's relationship with Magna.[12]   Diedrich contends that it renegotiated agreements and otherwise did all that could be reasonably expected of Diedrich to help Magna make its stores profitable.

Smith testified that Diedrich misrepresented the stores' profitability by overstating expected sales increases and omitting expenses, including a manager's salary and credit-card and banking fees.   The alleged omissions and misrepresentations are irrelevant to the implied covenant claim.   The implied covenant applies after a contract is formed.   The covenant imposes *performance* obligations.   The omissions and misrepresentations occurred during contract

---

[11] The Release of Magna stated: "[Diedrich], on behalf of itself and the other Diedrich Parties, hereby forever releases, remises and discharges, and forever holds harmless the Magna Cum Latte Parties from any and all Claims which any member of the Diedrich Parties had, has or may have against any member of the Magna Cum Latte Parties arising out of or relating to any transaction or relationship with any of the Magna Cum Latte Parties from the beginning of time until the date of this Release . . . "

[12] Specifically, Magna's complaint describes thirteen acts that individually or collectively violated the implied covenant: "(i) refusing to exercise its option on the Westheimer Master Lease . . . , (ii) failing to perform its contractual obligations in good faith under the Franchise Agreements, (iii) engaging in a course of conduct designed to destroy Magna's business, (iv) unduly imposing restrictive and repressive conditions upon Magna's operation of its franchises, (v) delaying and refusing all of Magna's attempts to expand its franchise locations under the terms of the ADA, (vi) imposing penalties and retroactive royalty fees, (vii) intentionally causing the termination of the Westheimer Franchise Agreement and Westheimer Sublease, (viii) fraudulently inducing Magna to enter into the Letter Agreement without intending to live up to the terms of the Letter Agreement, (ix) failing to provide the further assurances agreed to in the Purchase Agreement, (x) engaging in a course of conduct designed to deny Magna the reasonable and intended benefits of the Franchise Agreements, ADA, Subleases and Purchase Agreement, (xi) intentionally or recklessly omitting material financial information when negotiating the Franchise Agreements, ADA, Subleases and Purchase Agreement, and (xii) breaching the agreement made by Diedrich's CEO eliminating rent payments.

formation, before any performance was required by either party. The omissions and misrepresentations may have supported a fraud or misrepresentation claim. However, Magna waived any such claims in the 2004 Letter Agreement.

### b. Formal and Informal Trade Agreements.

Magna contends that Diedrich imposed restrictive fees and penalties, repudiated informal agreements, and otherwise failed to perform contractual obligations. Specifically, Magna complained of royalty fees imposed, an alleged informal agreement made by Steve Coffee (Diedrich's CEO) to forgive rent due, and aspects of Diedrich's coffee bean distribution, including pricing, mislabeling, pre-payment requirements, and delivery issues.

The evidence does not support Magna's complaints. New royalty structures were voluntarily negotiated through the 2004 Letter Agreement. Evidence indicated that a new royalty structure was to Magna's benefit rather than detriment. Evidence did not support an informal agreement to waive rent. Steve Coffee expressly denied any informal agreement to waive Magna's rent. Crouch's testimony supported Coffee's denial. Magna's bean complaints were vague and undocumented. Diedrich's decision to require pre-payment before delivery of goods was reasonably based on Magna's financial condition.

### c. The Letter Agreement.

Magna contends that Diedrich's negotiation of the 2004 Letter Agreement breached the implied covenant. On October 26, 2004, Magna and Diedrich executed a Letter Agreement providing: mutual releases for any breaches or defaults that occurred prior to the agreement, waiver of the minimum development agreements, and an extension of the ADA. Crouch testified that Diedrich had decided not to exercise the Westheimer Store option before negotiating the Letter Agreement. E-mail exchanges among Diedrich employees supported this testimony. Yet

Diedrich did not disclose this intention to Dirk during the Letter Agreement negotiations. Diedrich did not formally state its intention to decline the Westheimer option until January of 2006. Moreover, approximately a week after the Letter Agreement was executed, Diedrich demanded that Magna sign sublease amendments before it would exercise any other lease option.

However, Smith was or should have been aware that Diedrich opposed exercising the options during the Letter Agreement negotiations. Diedrich attempted to include a sublease amendment within the 2004 Letter Agreement. The Letter Agreement contains a blank Article 2 as evidence of the negotiations that, though unsuccessful, nevertheless occurred. Magna voluntarily signed the Letter Agreement. Most importantly, there is no evidence indicating that Diedrich affirmatively mislead Magna with respect to its position on the lease options.

The Court denies Magna's claim of breach of the implied covenant of good faith based on conduct other than Diedrich's failure to exercise the Westheimer Store option.

### ii. Breach of the Area Development Agreement.

The Area Development Agreement ("ADA") granted Magna exclusive and non-exclusive rights to develop coffeehouses and kiosks in the Houston area. The ADA also imposed minimum development obligations on Magna that required Magna to develop new Diedrich coffeehouses yearly. Failure to comply with the minimum develop obligation was grounds for termination of the agreement. From 2001 through 2004, Magna never developed a new Diedrich coffeehouse or kiosk. Nevertheless, the 2004 Letter Agreement extended the ADA until May 31, 2006. The Letter Agreement also waived Diedrich's right to terminate the ADA based on Magna's failure to meet the minimum development requirements.

Diedrich asserts that Diedrich owed no obligations under the ADA. Diedrich contends that its obligations under the ADA were contingent upon Magna meeting certain conditions.

Those conditions included fulfilling the minimum development requirements and submitting copies of any agreement reached between Magna and the lessor of the new franchise location. Magna did not fulfill either condition.

The ADA required Magna to fulfill all its obligations under the ADA before the ADA imposed any obligations on Diedrich.   Section 6.2, "Condition Precedent to Company's Obligations" states:

> *"It shall be a condition precedent to Company's obligations pursuant to Section 6.1, that Developer shall have performed all his obligations under and pursuant to all agreements between Developer and Company."*

Obligations included compliance with the minimum development requirements, as well as a documentation requirement. Section 2.1.1 states:

> *"Developer shall construct, equip, open and thereafter continue to operate at Venues within the Development Area not less than the cumulative number of Full Service Coffeehouses within each of the Development Periods specified in Exhibit "'B.'"*

Exhibit B provides that Magna was to open a new franchise approximately once a year.

Magna was not in compliance with the minimum development requirement.   Magna never opened a new Diedrich coffeehouse or kiosk.  The alleged preliminary agreement with the University of Houston was not obtained until 2006.

However, Diedrich waived the minimum development requirements in the 2004 Letter Agreement.  The Agreement states:

> *"The Company hereby waives its right to terminate the ADA for Magna Cum Latte's failure to adhere to such Minimum Development Obligations, while expressly reserving all of the Company's other rights under the ADA."*

Diedrich's defense based on the minimum development requirement is without merit.

The ADA also required Magna to submit an executed letter of intent.   Section 6.1.1 states:

> *"After Developer [Magna] has located a site for construction of a "Diedrich Coffee" Coffeehouse, **Developer shall submit to Company** such information regarding the proposed site as Company shall require, in the form which Company shall from time to time require, **together with a copy of an executed letter of intent** containing the terms of the proposed Lease for such site.  Company may seek such additional information as it deems necessary within 30 days after Developer's submission of the letter of intent and require site information, and Developer shall respond promptly, accurately and completely to such request for additional information."*

Smith admitted that he never obtained or submitted a letter of intent.  Nevertheless, Magna alleged that Diedrich violated the agreement by failing to take reasonable action necessary for Magna to obtain the letter of intent.  Smith testified that the University of Houston would not enter a contract until they received a copy of Diedrich's form franchise agreement and contact information for a Diedrich representative.  On February 20, 2006, Smith sent an e-mail to Crouch requesting a form franchise agreement and contact information.[13]  Diedrich's counsel did not respond.  Smith testified that Magna lost his opportunity to establish a University of Houston kiosk because he was unable to provide the requested information.

Crouch's failure to provide the requested information did not violate an express provision of the ADA.  Nevertheless, Crouch's failure to take reasonable steps necessary for Smith to obtain the required letter of intent could constitute a violation of the implied covenant of good faith.

Based on trial testimony, the Court finds that Magna did not breach the implied covenant with respect to the ADA.  At trial, Crouch admitted that she had received Smith's information request and failed to respond.  However, Crouch testified to the following: Smith never followed-up on the information request via e-mail or phone.  Had Smith pursued the matter,

---

[13] The e-mail stated, in part "As I mentioned, the University needs a copy of the franchise agreement so that they can put together a draft my agreement with them (which I'll send you a copy of which when I receive it), so please send me a copy of the franchise agreement as soon as possible."

"Also, please let me know as soon as possible who the University should contact in design & development regarding the build-out, and if there's any other information you need from me, since again we're projecting an opening date of April 15[th]."

Crouch would have complied with the request.  Nothing in Diedrich's agreements prevented Smith from submitting copies of his franchise agreements to the University of Houston.[14]

Evidence demonstrates that, at most, Crouch acted negligently by failing to respond to Smith's information request.  The Court finds Crouch's non-malicious explanation for failing to respond to the request credible.[15]  Magna has submitted no evidence suggesting that Crouch failed to respond to Smith's initial request with bad faith or any intent to harm.  Smith never followed up on his request or made an attempt to provide the University the requested information with franchise agreements and contact information Smith already possessed.  Mere negligent or mistaken conduct does not constitute breach of the implied covenant of good faith. *Careau & Co v. Security Pacific Bus. Credit*, 222 Cal. App. 3d at 1395.

### iii. Wrongful Termination under the California Business Code.

Section 20020 of the California Business and Professions Code prohibits franchisors from terminating franchises without good cause.[16]  Magna's franchises terminated upon expiration of the leases.  Magna's Wrongful Termination cause of action is thus tied to Diedrich's decision to not renew the Westheimer Store sublease.[17]  At trial, Magna limited its

---

[14] Nor does the Court find credible Smith's testimony that he lost his opportunity to open a kiosk on the University of Houston largely because Diedrich failed to respond to his information request.  Testimony suggests that Smith's negotiations with the University of Houston were not as close to finalization as Smith contends.  Smith sent Crouch a single e-mail that did not emphasize or detail the alleged necessity or time-sensitivity of the requested information.  The Court finds it difficult to believe that Smith would not have subsequently contacted Crouch or other Diedrich employees had the information been truly necessary and had Smith's negotiations with the University of Houston truly been near a final agreement.

[15] Crouch testified that she failed to respond because of a heavy work-load, the e-mail's lack of urgency and importance, and her belief that Magna was in default under the ADA.

[16] The statute provides: "Except as otherwise provided by this chapter, no franchisor may terminate a franchise prior to the expiration of its term, except for good cause.  Good cause shall include, but not be limited to, the failure of the franchisee to comply with any lawful requirement of the franchise agreement after being given notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure the failure.

[17] Magna also contends that Diedrich violated § 20020's notice requirement.  The Court finds that Magna had adequate notice of termination.  Diedrich notified Magna of its intent to not renew the Westheimer Lease in a letter dated January 4, 2006.  The Lease did not expire until November 6, 2006.  Moreover, the notice provision applies

wrongful termination claim to Diedrich's decision to decline the Westheimer Store sublease.   As discussed in the Court's analysis of Magna's implied covenant of good faith claim, the Court finds that Diedrich wrongfully terminated the sublease.   Consequently, the Court holds that Diedrich violated the California Business Code.

**Conclusion**

Based on the forgoing, the Court holds that defendant Diedrich Coffee, Inc. did not breach the Area Development Agreement.   The Court holds that defendant Diedrich Coffee, Inc. did breach the implied covenant of good faith and fair dealing and Section 20020 of the California Business and Professions Code by failing to exercise the Westheimer Store lease option.   The Court will hold a separate trial on damages on February 6, 2008, 9:00 a.m.

Signed at Houston, Texas, on December 13, 2007.

MARVIN ISGUR
United States Bankruptcy Judge

---

only to decisions to terminate based on the franchisee's failure to comply with their franchise agreements.   The provision does not apply to termination for reasons independent of failure to comply with the franchise agreement terms.   Magna's franchise did not terminate because Magna failed to comply with agreement terms (though Magna may have been in default).   The franchise terminated because the Westheimer Store lease expired.