

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
05/09/2008

| | | |
|---|---|---|
| **IN RE:** | § | |
| **MAGNA CUM LATTE INC; dba** | § | **CASE NO: 07-31814** |
| **DIEDRICH COFFEE** | § | |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **COMERICA,** *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 07-03304** |
| | § | |
| **JULIE G. SMITH,** *et al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION ON DAMAGES

### Background

The present dispute arose from the purchase of three coffee franchises.

Defendant Diedrich Coffee, Inc. ("Diedrich") is a California-based coffee business that

operated coffeehouses and sold Diedrich franchises.  Diedrich owned four coffeehouses in

Houston, Texas.  Dirk J. Smith ("Smith") formed plaintiff Magna Cum Latte, Inc. ("Magna") to

purchase the Houston coffeehouses and Chrie8, Inc. ("Chrie8") to manage Magna.  Smith is the

sole shareholder of both Magna and Chrie8.  On May 9, 2001, Magna and Diedrich executed

franchise, sublease, and purchase agreements with respect to three of the Houston coffeehouses

(the "Westheimer Store," "Montrose Store," and "Clear Lake Store").  Diedrich closed the

fourth.  The parties also executed an Area Development Agreement ("ADA") that granted

Magna rights to develop additional Diedrich coffeehouses and kiosks within the Houston area. [1]

Magna paid $1,025,000 for the franchise, lease, and development rights.  Comerica Bank

---

[1] The ADA gave Magna the exclusive right to develop Diedrich coffeehouses in the Houston area and a non-exclusive right to develop Diedrich kiosks on the University of Houston campus and near the Clear Lake Store.

("Comerica") provided an $819,000 loan to finance the purchase.

Two aspects of the sublease agreements quickly sparked contention: renewal options and a "rent formula" used to determine Magna's rent.  Under Diedrich's Master Leases, the stores' initial lease terms expired in 2001, 2002, and 2004.  Diedrich held one or two five-year options on each store.[2] Diedrich's Master Leases did not require Diedrich to exercise the options. Magna's sublease agreements with Diedrich stated that the sublease terms lasted for ten years or the termination or expiration of Diedrich's Master Leases.  The subleases did not expressly require Diedrich to exercise the options or specify under what, if any, conditions Diedrich could decline the options.  The subleases also provided that Magna's payments would be based, in part, on a percentage of gross sales.  However, sales never met projections.  Consequently, Diedrich's obligations under its Master Leases exceeded Magna's obligations under the subleases.  In early 2004, Diedrich's situation worsened when its rent for the Montrose Store increased by $1,000 per month.  From 2003 until the Westheimer Store's closure in 2006, Diedrich repeatedly requested Magna to renegotiate the subleases and threatened to let the stores' renewal options expire if sublease amendments were not obtained.   Smith contended that the agreements obligated Diedrich to exercise the options.

In May of 2006, Diedrich did not exercise the Westheimer Store option.  Magna attempted to negotiate a new lease directly with the Westheimer Store's landlord, T-Con Properties, Ltd. ("T-Con").  However, Magna and T-Con were unable to reach an agreement. The Westheimer Store closed and Magna defaulted on its obligations to Diedrich.  Magna filed a chapter 11 bankruptcy petition on March 12, 2007.

---

[2] The stores had the following terms:
- Westheimer Store: lease expired November 7, 2001, with two five-year options.
- Montrose Store: lease expired on August 31, 2004, with one five-year option.
- Clear Lake Store: lease expired on July 20, 2002, with one five-year option.

On June 26, 2007, Magna filed this adversary proceeding against Diedrich.  Magna's complaint alleged that Diedrich violated express provisions of their agreements and engaged in bad-faith conduct that doomed Magna's business.  Magna asserted fourteen causes of action.[3] Magna sought lost profits and other damages exceeding $10,000,000.

On April 17, 2007, Comerica filed a suit against Magna, Chrie8, and Dirk and Julie Smith (the "Magna Defendants") in state court.  Comerica's complaint sought judgment for the unpaid balance of the $819,000 note plus accrued interest and attorneys' fees. The Magna Defendants filed a Plea of Intervention and Cross Claims asserting four claims against Comerica. The lawsuit was removed to this Court and consolidated with the adversary proceeding filed by Magna.

On July 20, 2007, Magna filed a partial summary judgment motion for breach of contract and breach of the implied covenant of good faith.  On August 29, 2007, Diedrich filed a summary judgment motion on all fourteen causes of action.  On August 30, 2007, Comerica filed a summary judgment motion for its breach of promissory note and personal guarantee claims, and the Magna Defendants' four claims.

On October 30, 2007, this Court issued its Amended Memorandum Opinion on the summary judgment motions.  The Court denied the Magna Defendants' summary judgment motion against Comerica and granted judgment for Comerica on all claims.  The Court denied Magna's summary judgment motion against Diedrich.  The Court granted Diedrich's summary judgment motion on all claims except: breach of the implied covenant of good faith and fair dealing, breach of the ADA, and wrongful termination under the California Business Code.

---

[3] Specifically, Magna asserted: breach of contract (express terms), breach of the implied covenant of good faith and fair dealing, common law fraud/fraudulent inducement, fraud in a real estate transaction, fraudulent concealment/fraud by non-disclosure, wrongful termination, tortious interference with contractual relationship, tortious interference with prospective business relationships, business disparagement, negligent misrepresentation, promissory estoppel, and detrimental reliance.

On November 6th and 7th, 2007, Magna and Diedrich submitted evidence on Magna's three remaining claims.  The Court held for Diedrich on Magna's ADA claim.  The Court held for Magna on the implied covenant and wrongful termination claims.

On February 6th and 7th, 2008, the Court held a damages hearing.  Magna seeks judgment in the amount $3,634,215.39, largely for lost profits and attorneys' fees and expenses.  Magna contends that attorneys' fees and expenses are authorized under fee-shifting provisions in the parties' agreements.

The Court first considers reasonable attorneys' fees and expenses allowed under the parties' agreements.  The Court then considers Magna's damages.

Based on the evidence presented, the Court finds that Magna is entitled to attorneys' fees and expenses in the amount of $275,000.00 and damages in the amount of $403,825.00.  The Court awards Judgment for Magna in the amount of $678,825.00.

### Jurisdiction and Venue

This Court has jurisdiction of this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. §1409.

### Attorneys' Fees and Expenses

#### i. Total Attorney Costs

Magna incurred (or might incur in the event of an appeal and collection difficulties) over $800,000.00 in attorneys' fees and expenses.  The total amount consists of the following:

- $131,193.00 for Magna's bankruptcy case.  The Court has previously approved $81,193.20, incurred through December 31, 2007.  Magna estimates that $50,000.00 will be incurred from January 1, 2008 through the close of the bankruptcy case.

- $674,364.61 for this adversary proceeding.  The Amount includes $508,023.26 incurred from April 6, 2007 through January 31, 2008, and $166,341.35 incurred from February 1, 2008 through March 6, 2008.

● $15,000.00 for collecting the judgment.

● $20,500.00 for an appeal.

Magna contends that it should be compensated for the above costs pursuant to the fee-shifting provisions in the parties' agreements.  Magna's lawsuit involved five contracts: the Purchase Agreement, the Westheimer Franchise Agreement, the Westheimer Sublease, the ADA, and the Letter Agreement.  With the exception of the Letter Agreement, each agreement included an attorney fee provision.  Typical of the agreements, paragraph 21.13 of The Westheimer Franchise Agreement provides:

> Should any party hereto commence any action or proceeding for the purpose of enforcing, or preventing the breach of, any provision hereof, whether by judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision hereof, or for declaration of such party's rights or obligations hereunder, ***the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection therewith, including, but not limited to, attorneys' fees.***  All sums which are due but unpaid to Company or Franchise shall bear interest from the date due at the highest rate permissible by applicable law.

(emphasis added).[4]

California law requires the Court to undertake a multi-step analysis for calculating contract-based attorneys' fees.  The Court must determine: (1) which, if either, party is entitled to fees under the contracts; (2) if a party is entitled to fees under the contracts, for what causes of action that party can receive compensation; (3) for compensable causes of action, the reasonable fees and expenses incurred litigating the causes of action.  The Court undertakes this analysis below.

---

[4] Diedrich's post-trial brief contends that any attorneys' fees award should be limited based on the fee-shifting provision's language limiting fee-shifting to the costs of "enforcing" the agreement.  Magna's litigation did not seek to *enforce* the agreement, but, rather, sought *damages* for breach of the agreement. The argument ignores the paragraph's unambiguous language: "or for damages for any alleged breach of any provision . . . " The fee-shifting provision clearly allows fee-shifting for litigation seeking damages for breaches of the agreement.

### ii. Fee-Shifting Under California Law

Bankruptcy Courts should enforce fee-shifting provisions in contracts to the extent provided by state law. *In re Hassen Imports P'ship*, 256 B.R. 916, 921 (9th Cir. BAP 2000) ("A 'prevailing party' in a bankruptcy proceeding may be entitled to an award of attorney fees in accordance with applicable state law *if state law governs the substantive issues raised in the proceedings*.") (quoting *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir. 1997)). "State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 1992).

The parties have litigated this case under California law. Under California law, fee-shifting is allowed if authorized by statute or contract. West's Ann. Cal. C.C.P. § § 1021, 1717; *Amtower v. Photon Dynamics, Inc.*, 71 Cal. Rptr. 3d 361, 379 (Cal. App. 6th Dist. 2008). Magna and Diedrich's agreements and California statute authorize fee-shifting in favor of the "prevailing party." § 1717; *Exxess Electronixx v. Heger Realty Corp.*, 64 Cal. App. 4th 698, 706 (Cal. App. 2d Dist. 1998) ("If a cause of action is 'on a contract,' and the contract provides that the prevailing party shall recover attorneys' fees incurred to enforce the contract, then attorneys' fees must be awarded on the contract claim in accordance with Civil Code section 1717.").

### iii. Prevailing Party

Magna and Diedrich dispute the meaning of "prevailing party." Magna's initial complaint asserted fourteen causes of action. Magna was successful on only the implied covenant and wrongful termination claims. Nevertheless, Magna contends that there can only be one prevailing party because all the causes of action arose from the same transaction; the purchase of three franchises. Diedrich contends that the Court must determine who was the prevailing party with respect to each disputed agreement. Diedrich reasons that because Diedrich was wholly

successful with respect to claims asserted under the ADA, Diedrich is the "prevailing party" entitled to fees and expenses under that agreement.

Under California law, "[t]he trial court possesses broad discretion in determining the prevailing party to a contract." *Nasser v. Superior Court*, 156 Cal. App. 3d 52, 59 (Cal App. 4th Dist. 1984). Courts generally "adopt a pragmatic approach, determining prevailing party status based on which party succeeded on a practical level." *Graciano v. Robinson Ford Sales, Inc.*, 50 Cal. Rptr. 3d. 273, 281–82 (Cal. App. 4th Dist. 2006). The California Supreme Court has defined "prevailing party" as used in a contract's fee-shifting provision to mean the party who achieved "their litigation objective." *Santias v. Goodin*, 17 Cal. 4th 599, 609 (Cal. 1998); *Garciano*, 50 Cal. Rptr. 3d at 281–82 ("Under this approach, 'the court exercises its discretion to determine the prevailing party by analyzing which party realized its litigation objectives.") (quoting *Castro v. Superior Court*, 116 Cal 4th 1010, 1019 (Cal. App. 4th Dist. 2004)).  A party can achieve their litigation objective "if they succeed on *any significant issue* in litigation which achieves *some of the benefit* the parties sought in bringing the suit." *Garciano*, 50 Cal. Rptr. 3d at 284 (emphasis in original) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "Courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.'" *Garciano*, 50 Cal. Rptr. 3d at 282 (quoting *Castro*, 116 Cal. 4th at 1019–20).

In summary, the California Supreme Court has defined the "prevailing party" standard as follows:

> Accordingly, we hold that in deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objective as disclosed by the pleadings, trial briefs, opening statements, and similar sources.  The prevailing party determination is to be made only upon final resolution of the contact claims and only by "a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.

*Hsu v. Abbara*, 9 Cal. 4th 863, 876 (Cal. 1995).

When multiple contracts are disputed, generally, the Court must determine which party was the prevailing party with respect to each separate contract. *Arntz Contracting Co. v. St. Paul Fire and Marine Ins. Co.*, 47 Cal. App. 4th 464, 491 (Cal. App. 1st Dist. 1996) ("When an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action."). However, when separate contracts are "part and parcel of the same transaction," the contracts are treated as a single contract. *Beal Bank, S.S.B. v. A & T Investments*, 2001 WL 1508036 (Cal. App. 4th Dist. Nov. 26, 2001). Section 1642 of the California Civil Code provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." West's Ann. Cal. Civ. Code § 1642. *See also Paramount Pictures Theatres Corp. v. Partmar Corp.*, 97 F. Supp. 552, 554–55 (S.D. Cal. 1951) ("Though two documents were executed – one a lease and the other a franchise agreement – it is evident the lease would not have been entered into if the franchise agreement had not also been entered into at the same time; and, conversely, the franchise agreement would not have been entered into unless the lease had been entered into at the same time. Although there were two separate documents – one the lease and the other the franchise agreement – they were executed at the same time, between the same parties, for the same period of time, and, as a consequence, must be considered as one agreement."); *People v. Sangiacomo*, 180 Cal. Rptr. 594, 602 (Cal. App. 1st Dist. 1982).

Magna's action involved five contracts: the Purchase Agreement, the Westheimer Franchise Agreement, the Westheimer Sublease, the Area Development Agreement, and the Letter Agreement. With the exception of the Letter Agreement, each agreement included an

attorney fee provision.   The agreements containing fee-shifting provisions were executed contemporaneously and referenced each other.   The agreements were executed for largely one purpose: the purchase of three Diedrich Coffee franchise.   As in the *Paramount Pictures* case, the parties would not have entered into any one agreement without the others.   The purchase price provided in the Purchase Agreement was based upon the property and rights provided for in the Franchise, Lease, and Area Development agreements.   The agreements were largely "executed at the same time, between the same parties, for the same period of time." *Paramount Pictures Theatres Corp.*, 97 F. Supp. at 554–55. Consequently, the Court declines to undertake a separate "prevailing party" analysis with respect to each contract.   The Court will consider which party achieved their "litigation objective" with respect to the claims arising from the agreements.

Magna is a prevailing party with respect to the agreements.   Magna's principal litigation objective was to recover damages arising from the Westheimer Store closure.   Magna has achieved their objective through success on Magna's implied covenant of good faith and fair dealing claim. Diedrich's success in defending most claims does not change Magna's "prevailing party" status.   A plaintiff may recover on only one of several claims, and still be a "prevailing party" if the successful claim was on a "significant issue." *Garciano*, 50 Cal. Rptr. 3d at 284. The implied covenant claim was a "significant issue." *Id*. The bulk of the parties briefing and trial time was devoted to the implied covenant claim.   Pursuant to this Memorandum Opinion, the Court is ordering a significant damages Judgment in Magna's favor based on Diedrich's breach of the implied covenant.

Nevertheless, an accurate view of the overall litigation between the parties includes a determination that this lawsuit included two distinct disputes.   The dispute with respect to the ADA constituted a dispute that is unrelated to the dispute regarding the Westheimer Store lease.

The disputes involve distinct facts.  Magna could have asserted the implied covenant and ADA claims in independent causes of action, in which case, there is no question that Diedrich would have been the prevailing party in the ADA dispute.  Within this adversary proceeding, Diedrich has prevailed on the ADA dispute.

However, Diedrich did not meet its evidentiary burden with respect to fees incurred related to the ADA.  Diedrich's counsel testified and produced documents showing all fees and expenses incurred defending against all claims.  Diedrich failed to produce testimony or evidence allocating fees and expenses between the separate causes of action.  The Court has no reliable means for allocating Diedrich's fees and expenses incurred on the ADA claims.  Given the paucity of evidence, the Court finds that Diedrich failed to sustain its burden of proof with respect to its ADA attorneys' fees and expenses.[5] The Court does consider Diedrich's success on the ADA claims when calculating Magna's attorneys' fees and expense.

### iv. Reasonable Fees and Costs

Determining that Magna is entitled to attorneys' fees and costs does not end the issue. *Thayer v. Wells Fargo Bank, N.A.*, 112 Cal. Rptr. 2d 284 (Cal. App. 1st Dist. 2001). The Court now considers the proper fee and expense amount. *Garciano*, 144 Cal. App. 4th at 153 ("Whether an [attorney fee] award is justified and what amount the award should be are two distinct questions, and the factors relating to each must not be intertwined or merged.") (quoting *Flannery v. Cal. Highway Patrol*, 61 Cal. App. 4th 629, 647 (Cal. App. 1st Dist. 1998)).

To determine the proper fee award, the Court must consider: (a) whether Magna is entitled to compensation for attorneys' fees and expenses incurred in litigating all fourteen causes of action; and (b) the reasonable fees and expenses for the compensable causes of action.

---

[5] Additionally, the claims Diedrich successfully defended against were mostly tort claims.  As the Court discusses in greater detail later in this opinion, tort claims are generally irrelevant to the "prevailing party" analysis. *Excess Electronixx*, 64 Cal. App. 4th at 708.

The Court considers the questions separately.

### a. Claims for Which Fee-Shifting Applies

Diedrich contends that Magna can only be compensated for fees and expenses incurred on causes of action arising from the contracts.  Magna asserted fourteen causes of action.  Many sounded in tort, not contract.

Generally, California statute does not authorize fee-shifting for costs incurred litigating tort claims. *Reynolds Metal Co. v. Alperson*, 25 Cal. 3d 124, 129 (Cal. 1979); *Exxess Electronixx*, 64 Cal. App. 4th at 708 ("Civil Code section 1717 does not apply to tort claims; it determines which party, if any, is entitled to attorneys' fees on a *contract claim only*") (emphasis in original).[6]

However, costs incurred for litigating contract claims need not be separated from costs incurred for litigating tort claims if the claims are sufficiently related.  The California Supreme Court has held: "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." *Reynolds Metals Co.*, 25 Cal. 3d at 129–30. "A litigant may not increase his recovery of attorney's fees by joining a cause of action in which attorneys' fees are not recoverable to one in which an award is proper." *Id* at 129.  "Conversely, plaintiff's joinder of causes of action should not dilute its right to attorney's fees." *Id*.

Consequently, if the claims are "inextricably intertwined," the Court need not "separate the multitude of conjoined activities into compensable or noncompensable time units." *Abdallah v. United Savings Bank*, 43 Cal. App. 4th 1101, 1111 (Cal. App. 1st Dist. 1996) (quoting

---

[6] Nor does the Court find that the parties' contracts provided for attorneys' fees for tort claims.  The fee-shifting provision did not have broad language authorizing fees and costs for any action arising out of the agreements.  Rather, fee-shifting was limited to actions related to "breaches" of the agreements and damages for alleged breaches. *See Exxess Electronixx*, 64 Cal. App. 4th at 708–09. Additionally, Magna offered no evidence suggesting that the parties intended the fee-shifting provision to include costs incurred for non-contract claims.

*McCasland v. Beckman*, No. E041105, 2008 WL 101718 *13 (Cal. App. 4th Dist. Jan. 10, 2008)
"[A] fee award need not be apportioned 'where plaintiff's various claims involve a common core
of facts or are based on related legal theories." (quoting *Drouin v. Fleetwood Enters.*, 163 Cal.
App. 3d 486, 493 (Cal. App. 3d Dist. 1985). Ultimately, "[a]pportionment of a fee award
between fees incurred on a contract cause of action and those incurred on other causes of action
is within the trial court's discretion." *Abdallah*, 42 Cal. App. 4th at 1111.

Of Magna's fourteen causes of action, only the breach of contract and breach of the
implied covenant claims are contract claims.

The claims generally fell under five groups of alleged facts, relating to the following:

● interpretation of the agreements, including the parties understandings and
representations (breach of contract, breach of the implied warranty of good faith
and fair dealing, wrongful termination, common law fraud, fraudulent
inducement, fraud in a real estate transaction, fraud by non-disclosure, fraudulent
concealment, negligent misrepresentation, promissory estoppel, detrimental
reliance; tortious interference with contractual relationship with Comerica).

● Magna's attempts to open University kiosks (tortious interference with
prospective business relationships).

● Magna's negotiations with T-Con (tortious interference with prospective
business relationships, business disparagement).

Two tort claims involved a separate core of facts that were not plead with respect to the
contract claims. The claims for tortious interference with prospective business relationships with
the University of Houston and Rice University arose from Diedrich's alleged failure to provide
Magna with copies of certain documents. The claims for tortious interference with prospective
business relationships with T-Con Properties and business disparagement arose from Diedrich's
alleged misrepresentations to T-Con. Magna is not entitled to compensation for fees and
expenses with respect to these claims.

The remainder of the tort and contract claims arose from a common core of facts

involving Diedrich's execution and performance of the Westheimer Store lease: what the agreements said, Diedrich's representations and omissions concerning the agreements, and Diedrich's failure to exercise the Westheimer Store lease option. The implied covenant claim concerned facts related to interpretation of the agreements (whether Diedrich was required to exercise the Westheimer Store option) and the parties' intent with respect to the agreements (whether the parties intended for Diedrich to exercise the Westheimer Store option under the circumstances presented). Most of the tort claims concern the same facts relating to the interpretation of the agreements and the parties' intent (whether Diedrich misrepresented the contents of the agreements and its intentions with respect to the Westheimer Store lease option). Accordingly, the Court finds that the claims were "inextricably intertwined." *Abdallah*, 43 Cal. App. 4th at 1111. Magna is entitled to compensation for fees and expenses incurred with respect to all but the tortious interference with prospective business relationships and business disparagement claims.

Magna also incurred a significant amount of time and expense on litigation with Comerica. Magna seeks fee-shifting pursuant to agreements executed by Magna and Diedrich. Comerica was not a party to the agreements. Consequently, Diedrich is not liable for fees and expenses incurred in litigation with Comerica. Moreover, Magna was wholly unsuccessful against Comerica. This Court granted summary judgment for Comerica on all claims. There is no basis for awarding Magna fees and expenses incurred during the Comerica litigation. Magna's counsel testified that of the fees and expenses requested, $39,769.50 was incurred on the Comerica claims.[7]

---

[7] Magna contends that Magna is nevertheless entitled to fees associated with Comerica because "the nature of the communications between Diedrich and Comerica was such that it was difficult to tell who may have breached their obligations." Magna asserts no legal basis for awarding fees incurred litigating claims against a party who was not

Consequently, Magna is entitled to reasonable fees and costs incurred litigating all claims except the following: tortious interference with prospective business relationships with the universities, tortious interference with prospective business relationship with T-Con, business disparagement, and claims against Comerica.

### b. Determination of Reasonable Fees

Only "reasonable" attorneys' fees and expense can be awarded by the Court. West's Ann. Cal. Civ. Code § 1717(a) ("In any action on a contract, where the contract specifically provides that attorneys' fees and costs, which are incurred to enforce that contract, shall be awarded to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled to *reasonable* attorney's fees in addition to other costs.")

"It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . ." *Melnyk v. Robledo*, 64 Cal. App. 3d 618, 623 (Cal. App. 2d Dist. 1976). "The value of legal services performed in a case is a matter in which the trial court has its own expertise." *Id*. In determining a fee, the Court "is governed by equitable principals." *PLCM Group v. Drexler*, 22 Cal. 4th 1084, 1095 (Cal. 2000) (quoting *Montgomery v. Bio-Med Specialties, Inc.*, 183 Cal. App. 3d 1292, 1297 (Cal. App. 4th Dist. 1986)). Ultimately, the Court should use its discretion to "fix the fee at the fair market value for the legal services provided." *Id*.

California courts generally begin a fee-shifting inquiry with a lodestar calculation. *PLCM Group*, 22 Cal. App. 4th at 1095. The lodestar calculation is generally based on hours reasonably expended and a reasonable hourly rate. *Gisbrecht v. Barnhart*, 535 U.S. 789, 802 (2002).

---

subject to the contract containing the relevant fee-shifting provision. To the extent that Magna's argument is based on the perceived equities, the Court is awarding attorneys' fee and expenses in an amount the Court finds equitable.

Strasburger submitted affidavits, time-records, and testimony supporting their requested fees. The Court finds the time invested, expenses incurred, and rate billed to be reasonable. This case involved substantial summary judgment motions, two days of trial time litigating liability, two days of trial time litigating damages, extensive expert testimony, and substantial post-trial briefing. The summary judgment motions were well-written, researched, and reasoned. At the close of the merits trial, the Court complimented all attorneys on their courtroom presentations. The post-trial briefs were also well-done. The court does not find any evidence of excessive time allocation. The Court does not find the hourly rates as unreasonable for attorneys of Strasburger's quality. Consequently, Strasburger's requested fees are reasonable.

However, the fees and expenses must be reduced to account for fees and expenses incurred on legal work that does not fall under the contractual fee-shifting provision. As discussed earlier, the parties' agreements and California Law do not allow compensation for the tortious interference, business disparagement, ADA, or Comerica claims. Magna's counsel has testified that the costs incurred litigating the Comerica claims amount to approximately $39,769.50. Magna's fee and expense records do not apportion costs incurred for the ADA or other non-compensable claims. Costs incurred on non-compensable claims can not be ignored. Based on the fee and expense evidence presented, the Court must estimate which fees and expenses should be apportioned to these claims.[8]

### c. Lodestar Adjustment Factors

The lodestar amount must be further adjusted pursuant to adjustment factors articulated by California Courts. The lodestar calculation does not end the analysis. The Court must also

---

[8] Additionally, the contract's fee-shifting provision does not apply to legal costs incurred for Magna's bankruptcy case. The fees' may be considered consequential damages. However, the fees did not arise from litigating claims arising from the parties' agreements.

consider the following factors: (i) the nature, difficulty, and stakes of the litigation; (ii) skill required and employed; (iii) attention given and time and labor required; (iv) likelihood that the litigation precluded other employment; (v) time limitations; (vi) nature and length of the professional relationship; (vii) experience, reputation, and ability of the lawyers; (viii) whether the fee is fixed or contingent; (ix) informed consent of client; (x) success or failure; and (xi) other circumstances. *Glendora Cmty. Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 474 (Cal. App. 2d Dist. 1984); *Melnyk*, 64 Cal. App. 3d at 624; *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975).

### i. Non-Applicable Factors

Strasburger's attorney's performed their job admirably.  The attorneys were well qualified and completed their tasks with competence.  The Court encouraged parties to try the case in an expedient matter.  The case, though not overly complex, was not a simple matter either.  Resolution involved interpretation of ambiguous contracts and an ambiguous area of California law, and two days of trial time for both determinations of liability and damages. However, neither the nature of the litigation, the skill, attention, quality of the attorneys, time limitations, or client issues were so above the norm to adjust an upward adjustment.

### ii. Success or Failure

Other factors warrant a downward adjustment.  The Court must also consider the parties' success on the matter. *PLCM Group*, 22 Cal. 4th at 1096. Though Magna prevailed on a key issue, Magna raised twelve other claims that failed.  Pursuant to this opinion, the Court will award a significant damage award.  But the damage award does not nearly equal that which Magna sought.  The "success and failure" of the party must be considered. *Id.* Magna's case ended with some success, but also with some failure.

iii. Contingent Nature

On June 22, 2007, Strasburger and Magna executed a contingency fee agreement (docket no. 61, case no. 07-31814).[9] The agreement provided that Strasburger would be compensated for all litigation based on a contingent fee equal to 1/3 of any damage recovery or debt reduction. Magna agreed to pay $60,000.00 for initial expenses and pay any expenses in excess of the $60,000.00 from Magna's damage award.   On July 26, 2007, this Court approved the contingency fee agreement as reasonable (docket no. 83).   Diedrich contends that the contingency fee agreement should conclusively determine the fee award.

The affect of a contingency fee agreement on a Court's fee analysis has been litigated with mixed results.   California Courts of Appeal have upheld district court fee awards that paralleled a contingency fee agreement. *Glendora Cmty. Redevelopment Agency*, 155 Cal. App. 3d 465; *Parker v. City of Los Angeles*, 44 Cal. App. 3d 556 (Cal. App. 2d Dist 1974).   Appellate Courts have also held that an award based solely on a contingency fee agreement is improper. *McCasland*, 2008 WL 101718 *10; *People ex rel Dept. of Transp. v. Yuki*, 31 Cal. App. 4th 1754, 1767 (Cal. App. 6th Dist. 1995); *Vella v. Hudgins*, 151 Cal. App. 3d 515 (Cal. App. 2d Dist. 1984).[10]

The Court derives the following principal from the California cases: a court may award reasonable attorneys' fees in an amount equal to that provided in a contingency fee agreement.

---

[9] The contingency fee agreement applies to "potential litigation representation ("Litigation") of Magna Cum Latte, Inc. ("MCL") with regard to any claims for damages or debt relief against its franchisor, Diedrich Coffee, Inc. and any related parties and its claims/defenses against its lender, Comerica Bank, and any related parties."

[10] Magna also cites federal cases dealing with statutory fee awards in civil-rights cases.   The Court does not find those cases directly applicable.   The cases involve federal law, not California state law.   Moreover, the concern motivating those cases is not present here.   In many civil rights cases, the actual damages suffered by a plaintiff may be minimal.   Consequently, if a fee was awarded based on a contingent fee agreement, the attorney compensation may be insufficient to encourage lawyers to represent parties who assert claims involving rights that are important, but not necessarily monetary valuable. *See Quesada v. Thomason*, 850 F.2d 537 (9th Cir. 1988).

However, the contingency fee award must be a reasonable fee and the court must determine that it is a reasonable fee by considering the lodestar amount and the factors used to adjust the lodestar amount. *See Vella*, 151 Cal. App. 3d at 520.[11] Ultimately, the purpose of a fee analysis is to arrive at a reasonable fee. *PCLM Group*, 22 Cal. 4th at 1095. A reasonable fee is the fair market rate in the prevailing community. *Id.* In some instances, a fee equal to that provided in a contingent fee agreement may be the best denomination of the market rate. *See Glendora Cmty. Redevelopment Agency*, 155 Cal. App. 3d 465.

Accordingly, the Court gives significant weight to the contingent fee agreement. The contingent fee takes into account all the relevant lodestar adjustment factors.  The percentage contracted for by Strasburger presumably takes into account the difficulty of the issues, attention required, and extent to which time is taken from other work. *See Carma Developers Inc. v. Marathon Dev. Cal., Inc.*, 259 Cal. Rptr. 908, 913–14 (Cal. App. 6th Dist. 1989) ("Thus, the uncertainty not only of the outcome of the litigation but also of its costs in terms of attorney's time and efforts, considering the novelty of the question, was evidently taken into account by Carma's attorneys when they set the terms of their contingency fee arrangement.  Carma's attorneys cannot, therefore, question the reasonableness of those terms.") (reversed on other grounds). A contingent fee is directly tied to counsel's success and failures.  The fee ensures that Strasburger is compensated only for claims that arise from the contract containing the fee-shifting provision.  Compensation is limited to the implied covenant claim which arises from the contract.  Moreover, the fee is based on damages arising from claim that constituted the bulk of

---

[11] The *Vella* court stated: "Our research has disclosed no cases resolving the precise issue presented here: whether a trial court must award fees pursuant to the terms of a contract between the prevailing party and his or her attorney. We believe that the trend of the cases, however, is toward the conclusion that a trial court may consider the terms of the parties' contract, along with other factors, but that the terms of the contract do not compel any particular award." *Vella*, 151 Cal. App. 3d at 520.

this litigation: breach of the implied covenant of good faith and fair dealing.

Additionally, the contingency fee agreement executed by market participants presumptively represents a "fair market value for the legal services provided." Magna and Strasburger executed the contingent fee agreement with full knowledge of the potential risks and rewards of the litigation.[12] The parties arrived at a 1/3 contingent fee to compensate for the risks and rewards. A 1/3 contingent fee is within the range of reasonable contingent fees this Court routinely sees. The Court previously approved the contingent fee as a reasonable fee (docket no. 83). That the contingent fee is a reasonable fee is without dispute.[13] The contingent fee, contracted for by free market participants, is an objective and direct measure of the "fair market value" of the legal services provided. *PCLM Group*, 22 Cal. 4th at 1095. The "fair market value" is the end that the lodestar method fee analysis seeks. *Id*.

*d. The Lodestar Amount*

Ultimately, the Court should use its discretion to "fix the fee at the fair market value for the legal services provided" based on "equitable principals." *PLCM Group*, 22 Cal. 4th at 1095 (quoting *Montgomery*, 183 Cal. App. 3d at 1297).

---

[12] The June 22, 2007 Supplemental Professional Services Agreement provides:

> Strasburger's fees will be on a 33 1/3% contingency fee basis, to be earned and paid out of the proceeds of any litigation. The contingency amount will be calculated upon (i) any reduction in indebtedness to either Diedrich or Comerica (or any other related third-party) from the amount listed on the filed proof of claims with the bankruptcy court plus accrued interest and costs, which shall include reduced or eliminated principal, costs, attorney's fees; (II) damages actually recovered from either Diedrich or Comerica . . .

On July 27, 2007, this Court approved the Agreement (docket no. 83, case no. 07-31814).

[13] Diedrich cites federal cases suggesting that a bankruptcy court can not award a "reasonable fee" in variance of a contingent fee agreement previously approved. The Court finds the cases cited inapplicable. The cases involved fees sought pursuant to contingency fee agreements approved by a bankruptcy court and authorized by the Bankruptcy Code. This opinion does not establish the amount of fee that the bankruptcy estate owes Strasburger. Instead, this opinion establishes the amount that must be shifted to Diedrich pursuant to California law. The contingent fee agreement is relevant in that it is a factor that may conclusively establish the amount of the reasonable fee. However, the contract and California statute are the relevant basis from which Strasburger seeks the compensation.

Strasburger's lodestar fee would be $634,595.11 ($674,364.61 minus $39,769.50 for the Comerica claims). This would be a reasonable lodestar amount absent the presence of other factors. A substantial portion of the fees were incurred for claims for which Magna is not entitled to compensation. Because Magna failed to allocate costs among the claims, a substantial but unknown portion of Magna's recoverable attorneys' fees and expenses can not be established. The contingency fee award would be $214,608.31 (1/3 of the $403,825.00 in prejudgment-interest-adjusted lost profit damages, plus approximately $80,000.00 in litigation expenses[14]).

### e. Conclusion Regarding Fees

The Court considers the following circumstances: (1) Strasburger incurred $634,595.11 in fees and expenses for Magna; (2) a significant but known portion of the costs were incurred for claims on which Magna did not succeed; (3) the Court is not awarding funds to Diedrich on the ADA claim because Diedrich did not properly allocate its costs among the claims; (4) the contingency fee award alone is $214,608.31. Based on the contracts, the totality of the circumstances, and the equities of the case, the Court finds $275,000.00 to be the proper amount.

### Damages

Magna seeks $3,634,215.39 in damages.

The amount includes the following alleged lost profits:

- $904,000.00 — lost profits for the Westheimer Store's original term.

- $1,553,287.00 — lost profits for the Westheimer Store's 10-year renewal term.

The amount includes the following alleged consequential damages:

- $150,495.00 — lost value of the allocated purchase price of the Westheimer Store (if lost profits are not rewarded for the Westheimer Store's renewal period.

---

[14] Strasburger incurred approximately $120,000.00 in expenses. As discussed earlier, not all expenses are allowable even under a contingent-fee basis. Not all expenses were incurred on compensable claims.

● $150,495.00 — lost value of the allocated purchase price of the Clear Lake Store.

● $674,364.61 for this adversary proceeding.  The Amount includes $508,023.26 incurred from April 6, 2007 through January 31, 2008, and $166,341.35 incurred from February 1, 2008 through March 6, 2008.

● $15,000.00 — estimated legal fees for collection.

● $25,000.00 — estimated legal fees for appeal.

● $81,193.00 — legal fees for Magna's bankruptcy case through December 31, 2007.

● $50,000.00 — estimated legal fees and expenses for Magna's bankruptcy case from January 1, 2008 through the case's closure.

● $101,170.53 — Dirk Smith's indemnity claim for deficiency on the Comerica Note.

● $28,435.00 — legal fees and expenses for Mr. Abbott, incurred pre-petition, and as Magna's attorney.

● $51,266.25 — for legal fees for Mr. Abbot, incurred post-petition, and as Smith's personal attorney.

Magna seeks damages for breach of the implied covenant of good faith and fair dealing. The implied covenant is a contract concept for which California Court's award standard contract damages. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (Cal. 1988) ("As a contract concept, breach of the duty [of good faith and fair dealing] led to imposition of contract damages determined by the nature of the breach and standard contract principles.").

Damages should "put the plaintiff 'in as good a position as he or she would have occupied" if the defendant had not breached the contract.'" *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967 (Cal. 2004) (quoting 24 WILLISTON ON CONTRACTS, § 64:1, p. 7 (4th ed. 2002)). "[D]amages cannot, however, exceed what [plaintiff] would have received if the contract had been fully performed on both sides." *Id.* at 968 (citing

Cal. Civ. Code § 3358); *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.

App. 3d 442, 468 (Cal. App. 5th Dist. 1990).

> California damages law is not always clear.  As a California Appeals Court has stated:

> The rules of law governing the recovery of damages for breach of contract are very
> flexible.  Their application in the infinite number of situations that arise is beyond
> question variable and uncertain.  Even more than in the case of other rules of law, they
> must be regarded merely as guides to the court, leaving much to the individual feelings of
> the court created by the special circumstances of the particular case.

*Brandon & Tibbs*, 226 Cal. App. 3d at 455.

> Contract damages can be characterized as either "general damages (sometimes called
direct damages) or special damages (sometimes called consequential damages). *Lewis Jorge
Constr. Mgmt., Inc.*, 34 Cal. 4th at 968 (citing 24 WILLISTON ON CONTRACTS, § 64.1, p. 11–12; 3
DOBBS, LAW OF REMEDIES, § 12.2(3), p. 39–42 (2d ed. 1993)).  Consistent with the parties'
briefs, the Court will use the terms general damages and consequential (rather than special)
damages.

> General damages "are a natural and necessary consequence of a contract breach . . .
sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated
them." *Id.* (citing CALAMARI & PERILLO, THE LAW OF CONTRACTS, § 14–5, p. 525 (2d ed. 1977);
*Hunt Bros. Co. v. San Lorenzo Water Co.*, 150 Cal. 51, 56 (Cal. 1906).

> Consequential damages "do not arise directly and inevitably from" a contract breach. *Id.*
Consequential damages "are secondary or derivative losses arising from circumstances that are
particular to the contract or to the parties." *Id.* Consequential damages must be "foreseeable and
proximately caused by the breach of a contract." *Id.* at 969 (citing Cal. Civ. Code § 3300).
Consequential damages are "foreseeable" if they "were actually communicated to or known by
the breaching party (a subjective test) or were matters of which the breaching party should have

been aware at the time of contracting (an objective test)." *Id.* (citing *Mitchell v. Clarke*, 71 Cal. 163, 164–77 (Cal. 1886)); *A.A. Baxter Corp. v. Colt Indus., Inc.*, 10 Cal. App. 3d 144, 155 (Cal. App. 4th Dist. 1970) (Consequential damages "that can be recovered for a breach are only such as may reasonably be supposed to have been within the contemplation of the parties at the time of the making of the contract, as a probable result of a breach.") (quoting *Hunt Bros. Co.*, 150 Cal. at 56). Consequential damages are "proximately caused" by a breach if the breach was a "substantial factor" in bringing about the damages. *Bruckman v. Parliament Escrow Corp.*, 190 Cal. App. 3d 1051, 1063 (Cal. App. 2d Dist. 1987) ("In order to establish liability the plaintiff must show that the defendant's breach was 'a substantial factor' in causing the injury") (quoting 5 CORBIN ON CONTRACTS (1964)).

The Court considers Magna's alleged lost profits and other consequential damages separately.

### i. Lost Profits.

Plaintiffs can recover lost profits caused by a defendant's breach of contract. *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (Cal. App. 2d Dist. 1996). Plaintiff bears the burden of showing with "reasonably certainty" both the "*occurrence* and the *extent*" of alleged lost profits. *Sanchez-Corea v. Bank of America*, 38 Cal. 3d 892, 907 (Cal. 1985) (emphasis in original).

The parties' efforts during the damages trial was focused on the method of calculating the lost profits. The parties dispute whether: (i) Magna is entitled to lost profits for the 10-year franchise renewal period; (ii) the amount of lost profits for the remaining years of the original franchise period; (iii) the extent to which Magna should have mitigated its damages; and (iv) the proper discount rate for calculating the present value of the lost profits. The Court considers the

four issues separately.

### a. The Renewal Period

Magna is not entitled to lost profits for the ten-year renewal period.  Diedrich's obligation to renew the Westheimer Store franchise was contingent upon Magna fulfilling obligations provided in the franchise agreements.   Article 3.4.1 of the Westheimer Franchise Agreement provides:

> At the time the Franchisee delivers its Renewal Notice to Franchisor and at all time thereafter until the commencement of the Renewal Term, **Franchisee shall have fully performed all of its material obligations under** this Agreement, the Manuals and **all other agreements then in effect** between Franchisee and Company (or its affiliates) including, but not limited to, Area Development Agreement(s), Franchise Agreement(s), or Sublease Agreement(s).

Diedrich did not fully perform all of its material obligations under the agreements. Diedrich submitted to the Court a February 8, 2007 letter from Diedrich detailing the past-due amounts for rent, royalty, and product purchase obligations.   The total amount due was $144,376.96.

Magna contends that Magna's default should be waived under the doctrine of anticipatory repudiation.  Magna contends that the defaults occurred after Diedrich breached the implied covenant of good faith by stating its intention to decline the Westheimer Store option.  Diedrich formally stated its intention to decline the option via a letter dated January 4, 2006.  The lease option expired in May of 2006.  The defaults dated from July of 2006.

However, Smith testified that Diedrich had agreed to forgive the past due rents.  The anticipatory repudiation argument directly conflicts with Smith's own testimony.  The argument depends on a concession that Smith's own testimony was false.  Additionally, anticipatory-repudiation was not pled until Magna submitted its post-trial briefs.  Throughout this litigation, Magna has sought damages for breach of contract.   Anticipatory-repudiation and breach of

contract are distinct remedies. *H.B. Taylor v. Johnston*, 15 Cal. 3d 130, 137–38 (Cal. 1975). The plaintiff can immediately cease performance and sue for anticipatory repudiation. *Id*. Or the plaintiff can wait until the contract has been breached and sue for breach. *Id*.[15] The plaintiff may elect between the two remedies but can not do both.  Magna did not sue immediately upon Diedrich's expression of its intent to breach its contractual obligation.  Magna waited until the breach occurred and sued for the actual breach.  Magna can not raise anticipatory repudiation as a defense.

Even if Magna was not in default under the agreements, Magna would not be entitled to lost profit damages for the renewal period.  Again, plaintiff must establish "with reasonable certainty" both the "*occurrence* and *extent*" of alleged lost profits. *Sanchez-Corea*, 38 Cal. 3d at 836. Magna offered insufficient evidence that it would be able to extend the Westheimer Store's operations for an additional ten years.  Magna's inability to negotiate its own lease directly with T-Con and to find a replacement location greatly diminishes the probability that Magna could have continued operations beyond the expiration of the initial term.  Magna's rent, royalty, and product payment defaults, and inability to comply with the ADA's building requirements, further diminish the likelihood of a successful renewal.  Smith's inability to explain various transactions on Magna's balance sheets also does not reflect well on Smith's business acumen.  Magna has not met its burden with respect to lost profits for the ten-year renewal period.[16]

---

[15] The California Supreme Court describes the anticipatory breach doctrine as follows: "When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time . . . However, if the injured party disregards the repudiation and treats the contract as still in force, and the repudiation is retracted prior to the time of performance, then the repudiation is nullified and the injured party is left with his remedies, if any, invocable at the time of performance." *H.B. Taylor*, 15 Cal. 3d at 137–38.

[16] Magna also contends that Diedrich would have been required to extend the franchise term based on the implied covenant of good faith and fair dealing.  Magna's implied covenant-based argument suffers from the same

### b. Amount of Lost-Profits for Remainder of Initial Term

Magna's financial expert calculated Magna's lost profits to be $904,000.00.   Magna's expert's calculation was based on: (i) a 6% growth rate; (ii) a risk-free discount rate; (iii) exclusion of management fees; (iv) exclusion of amortization and depreciation deductions; and (v) a 5-year forecast.   Diedrich's financial expert calculated Magna's lost profits to be $200,670.00.   Diedrich's expert's calculation was based on: (i) a 2.5% growth rate; (ii) a risk-adjusted discount rate of 27.7%; (iii) inclusion of management fees; (iv) inclusion of amortization and depreciation deductions; and (v) a 4-and-1/2-year forecast.   The Court finds errors in both experts' calculations.

Both financial experts utilized a forecast of future performance at the Westheimer Store. The forecast was the expert's estimates of the amount of future profits that were lost as a result of the termination of Magna's operations at the Westheimer Store.   Both experts then utilized a yield formula to discount the future profits to today's present value.

The experts used different forecasts and dramatically different yields.   The Court begins with a resolution of the disputes in the forecasts.

1.   **Base Year Revenues.**   The two experts based their forecasts on a base year of operations and then applied varying growth assumptions in order to project the base year of operations into the future.   A substantial dispute exists as to the proper choice of a base year.

Magna's operations terminated on November 6, 2006.   Accordingly, there are no

---

speculative holes as Magna's conclusion that lost profits should be awarded for the renewal period.  The implied covenant limits the exercise of discretionary powers to purposes "within the reasonable contemplation of the parties at the time of [contract] formation." *Carma Developers, Inc.*, 2 Cal. 4th at 372. Magna offered insufficient evidence to establish under what conditions the parties contemplated the franchise renewal to be exercised.   More importantly, Magna offered insufficient evidence that the required conditions would have been present at the time renewal would have been exercised.  Based on the evidence of the parties' prior histories, the Court finds it unlikely that the implied covenant would have required Diedrich to exercise the renewal.   To conclude that the implied covenant would require Diedrich to exercise the renewal provision would be to guess the parties' contemplations and assume unlikely conditions.

complete operational records for calendar year 2006 since there were no operations in December, 2006 and only limited operations in November, 2006.

The purpose of a base year in a forecast of operations of an existing business is to be able to rely on an actual full year of operations for the purpose of projecting into the future.

Magna did not maintain its internal operating books on a monthly basis. Instead, the debtor utilized 13 four-week periods over the course of a year. The records utilized by the experts re-categorized these 13 periods into monthly reports. However, because of the weekly overlap, some months had overstated earnings and other months had understated earnings.

Although Magna's expert testified that he used a base year, he did not do so. Instead, Magna's expert attempted to extrapolate the first 10 months of 2006 into a full year. He did so in a very contorted fashion. First, he re-characterized a portion of November revenues as October revenues based on the 13 period anomaly. Second, he determined that November and December were normally a higher percentage of sales then any other two month period of the year. Third, he compared the (now adjusted) first 10 months of 2006 to the first 10 months of 2005 and determined a rate of growth. Fourth, he applied that rate of growth to the expected percentage of total revenues for November and December. Fifth, he created an artificial revenue stream for November and December of 2006. Sixth, he summed the 10 actual months and the two forecast months to arrive at a base year.

This procedure makes no sense and was done by Magna's expert in order to artificially inflate the base year for the forecast. Given the discount and growth rate utilized by the expert, a $1,000 increase in the base year resulted in an approximate $5,800 increase in the damages model.

Diedrich's expert argued that the correct base year should be the trailing 12 actual

months.  He argued that this would be the months of November, 2005 through October, 2006, resulting in an actual base year.[17]  The Court agrees.

2.  **Deduction of Cost of Goods Sold.**  In order to forecast losses, the revenues must be offset by the expenditures that are required to generate the revenues.  The two experts both based their cost of goods sold on a review of the historic data.  Magna's expert utilized a 30% cost of goods sold and Diedrich's expert utilized a 33% cost of goods sold.  The 33% is a better long term average; the 30% is a better reflection of recent results.  Although the Court believes that more recent data is more useful than historic data, the historic data must be taken into account.  It is unclear that the 30% ratio can be sustained.  The Court will utilize a 31% ratio.

3.  **Rent.**  The expert's rent forecasts varied by nearly 40%, with Magna alleging that forecast rent expense should be approximately $46,311 in the base year and Diedrich alleging approximately $66,211 for the base year.   The $46,311 amount is the rent for the property without the additional rent required by the lease.  See Article 4.1 of Sublease.  The sublease contains standard provisions requiring the tenant to pay various common area and other charges.  Although Magna's records are imperfect, the $66,211 is a reasonable approximation of the rent (as adjusted for common area and similar charges) for the base year and closely matches the actual rent paid in 2006.  The difference between the base rent and actual rent will be increased at 2.5% per year.

4.  **Depreciation and Amortization.**   Magna's expert argues that depreciation and amortization should not be deducted from the forecast cash flows in the calculation.  Diedrich's expert argues that these amounts should be deducted.  This deduction has a material affect on the total losses.  Utilizing Magna's discount rate, the effect would be approximately $160,000.

---

[17]  The defendant's expert actually used a number slightly higher than this base year, describing the higher number as being a generous approach.

Utilizing Diedrich's discount rate, the effect would be approximately $150,000. Diedrich's position is frivolous. Although Diedrich's expert came armed to the witness stand with approximately 10 separate texts on how to calculate business losses, not one of those texts suggested that depreciation and amortization should be included in the calculation. More importantly, the inclusion of depreciation and amortization make no sense in the context of the calculation. A present value calculation, like the one performed by Diedrich's expert, is intended to provide an amount, when measured in present dollars, of a future flow of cash. Depreciation and amortization are not a flow of cash. They are an accounting measure of how to expense (for the purposes of financial or tax reporting) a cash flow that has already occurred. Since the discounting is measuring a flow of cash, it is nonsense to include an item that does not represent a flow of cash in the calculation. No credible author or objective expert witness would suggest to do so.[18]

**5. Last One-Half Year.** Magna provided a five-year forecast of losses. Diedrich provided a four-and-one-half year forecast of losses. The choice between the two is based on the Court's finding with respect to whether the business would have operated at the Westheimer Store during the final six months of the lease term even if the franchise had expired. The Court finds that Magna would have operated the Westheimer Store during the six month period in

---

[18] *See* TERRY FLOYD, PRACTICING LAW INSTITUTE, *Calculation Issues in Commercial Damages*, 536 PLI/Lit 287, 300–01 (1993) ("At times the question of fixed or variable expenses will become an issue in damage calculations. The phrase "fixed costs" is often used synonymously with overhead costs. In estimating damages, the analyst should include all incremental (or variable) costs associated with the lost revenue . . . Depreciation is not an element of costs in most damage calculations. The same is true in the vast majority of cases dealing with tax benefits or consequences: they are not considered in calculating damages."); WILLIAM LINDSLEY ET. AL, CALIFORNIA JURISPRUDENCE 3D, *Damages* (April 2008); 23 CAL. JUR. 3D DAMAGES § 87; *Commercial Underwriters Ins. Co.*, 61 Fed. Appx. 120, 2003 WL 342314 *2 (5th Cir. 2003) ("Hence, variable costs related to lost business opportunities (*e.g.*, labor, utilities, etc.) must be deducted from a gross profit estimate, but fixed overhead costs that would have been incurred under any circumstances (*e.g.*, depreciation, rent, etc.) need not be. Reduced to a simple equation, lost income equals the revenue that would have been generated less those variable costs that would have been incurred in the absence of the complained of breach."); *Sure-Trip Inc. v. Westinghouse Eng'g.*, 47 F.3d 526, 531 (2d Cir. 1995) ("Where plaintiff is seeking to recover lost profits, such damages are equal to the revenue that would have been derived, less additional costs that would have been incurred, in performing the contract . . . Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits.")

dispute.  Smith testified that he would have maintained the operation.  Magna was not wholly dependent on Diedrich.  Smith testified that he had not always purchased beans and other supplies from Diedrich.  Smith could have continued operations during the six-month period and the Court has no reason to discredit Smith's testimony that he would have continued operations.

6.  **Management Fees.**  Magna's expert suggests that management fees should not be deducted as an expense.  Diedrich's expert disagrees.  Magna would be correct if the management services had no value.  If they had no value, then the management fee should be viewed as a profits distribution and not be deducted from the cash flows.  However, the overwhelming evidence is that the management fees did have value.  Smith, Magna's President, owns the management company.  He testified that when he allowed the operation to be managed without diligent management, revenues dropped precipitously and there were employee thefts.  Indeed, in 2003 and 2004 (years in which Smith stated that he did not spend as much time in Houston managing the store), revenues fell from 2002.  Revenues did not return to 2002 levels until 2006.  The absence of good management was costly to the business.

Moreover, Smith testified that his management company was not being overpaid.  Faced with this testimony, Magna's expert attempted to defend his position by stating that Magna would have to bear the same amount of management cost to operate fewer stores.  The argument was based on the assumption that Smith would still have to travel to Houston from California to provide the same management services for the remaining store. That response reflects an absence of economic reality.   As Diedrich's expert testified, the business should not pay more for management than a market rate.  If there were fewer stores, then a third party manager could be brought in to manage the other stores at a market rate.  It is unrealistic and unfair to impose a damages judgment against Diedrich in order to allow Magna to operate the business in an

economically unwise fashion.  No objective expert would have testified otherwise.

**7. Accounting.**   The accounting issue is whether these costs are fixed or variable. Magna alleges that the accounting and legal expenses should not be treated as an expense.  With no evidentiary or logical basis, Magna states that the accounting would cost the same with or without the Westheimer Store.   Diedrich correctly establishes that the accounting services include invoice processing, payroll, check writing, and location-by-location financial reporting. The accounting expense should be included.

**8. Growth Rate.**  Magna forecasts that revenues will grow at 6% per year, without interruption.  They have never done so before.  Indeed, since 2002, revenues have fallen.  Magna compared the Westheimer Store to Starbucks, and then forecast a 7% revenue increase. However, the uncontroverted evidence is that Starbuck's recent results reflect a 1% decline in same-store revenues.  The evidence reflects an increasingly competitive coffee business.  The Court has carefully considered the issue and accepts Diedrich's expert's forecast that revenue growth is most likely to be at the rate of inflation, an estimated 2.5% per year.

Based on the following, the Court finds that Magna suffered $570,539.13 in lost profit damages.  The Court next considers the present value of the damages.

*c. The Discount Rate*

The lost profits amount must be further reduced to present value by the appropriate discount rate for lost profits arising from an involuntarily-terminated business.  Magna contends that a risk-free discount rate applies.  Diedrich contends that the discount rate should be adjusted to account for the inevitable risks of business.

California courts have not uniformly applied a risk-adjusted or a risk-free discount rate to

31

measure the present value of projected lost profits.[19]  Some California courts have applied a risk-adjusted rate. *American Sheds, Inc. v. County of Los Angeles*, 66 Cal. App. 4th 384, 397 (Cal. App. 2d Dist. 1998). Some California courts have applied a risk-free rate. *Kairos Scientific Inc. v. Fish & Richardson P.C.*, No.'s A107085, A107486, 2006 WL 171921 (Cal. App. 1st Dist. Jan. 24, 2006); *Daum Dev. Corp., et al. v. Yuba Plaza, Inc.*, 89 Cal. Rptr. 458, 465–66 (Cal. App. 3d Dist. 1970), *overruled on other grounds*. Some non-California state courts have applied a risk-adjusted rate. *Energy Capital Corp.*, 302 F.3d 1314, 1332–34 (Fed. Cir. 2002); *In re Lambert*, 194 F.3d 679, 681 (5th Cir. 1999) ("The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved."); *Douglas v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1143 (7th Cir. 1985) (noting that an expert's damage estimate was erroneous because "in discounting to present value, the economist failed to correct for the extreme riskiness of the earnings stream for which he was trying to find a present value."). Some non-California state courts have applied a risk-free rate. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 836–37 (8th Cir. 2005). No Court has stated that a risk-adjusted or a risk-free discount rate is required under California law.[20]

Based on the divergent approaches taken by the California Courts, this Court can only conclude that the appropriate discount-rate is a question of fact that this Court must decide based

---

[19] Magna's brief cites scholarly articles discussing the merits of a risk-free or risk-adjusted discount rate.  Like California courts, the articles offer divergent opinions.  The opinions are largely based on policy concerns that are best addressed by the California legislature.  This Court is charged with interpreting California law.  California law, as it exists, requires the Court to weigh the evidence offered and determine the discount rate that achieves the most "reasonable proximate estimation" of lost profits.

[20] Magna also contends that a risk-free discount rate is required by California's pattern jury charge.  The Court does not read the jury charge as precluding consideration of a risk-adjusted discount rate.  The charge provides, in part: "To find present cash value, you must determine the amount of money, which if reasonably invested today, will provide [*name of plaintiff*] with the amount of [*his/her/its*] damages."  Nothing in that prevision precludes consideration of a risk-adjusted discount rate.

on the evidence presented.  Magna admits as much in its own brief.[21]

The Court holds that a risk-adjusted discount rate is the more appropriate discount rate for calculating a business's lost profits.[22]  The Court finds the Federal Circuit Court's reasoning in *Energy Capital Corp*. persuasive:

> Energy Capital argues that once the Court of Federal Claims determined that its profits were reasonably certain, no further consideration of risk was appropriate, because risk already had been considered in determining whether there would have been profits.  We disagree.  A venture that is anticipated to produce $1 million in profits and that has a 95% chance of success is obviously more valuable than a venture that is anticipated to produce $1 million in profits with only a 90% chance of success - and yet, both ventures would likely be determined to have a reasonable certainty of producing profits.  Therefore, the fact that the trial court has determined that profits were reasonably certain does not mean that risk should play no role in valuing the stream of anticipated profits.

*Energy Capital Corp*., 302 F.3d at 1333.

The forecasts we are dealing with are hardly without risk.  They are substantially risky.

Nevertheless, it is not a speculative business that has never previously been in operation.  There

---

[21] Magna also contends that the doctrine of "anticipatory breach" requires a risk-free discount rate.  No California state court opinion support this conclusion.  Magna cites a New York state court opinion.  *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161 (N.Y. 1989).  The New York court held that a risk-free discount rate should be used to measure the present value of damages arising from a breached contract.  The damages sought were general damages for monies the defendant promised to pay in a preexisting contract. *Id.* at 1164. Plaintiff did not seek special damages for lost profits. *Id.* The Court reasoned that the doctrine of anticipatory breach allows a non-breaching party to immediately cease performance and claim full damages for the breach. *Id* at 1164–65. Because the doctrine does not require the plaintiff to prove its ability to perform before claiming full damages, a discounted-rate that takes into account the plaintiff's potential inability to perform, is inconsistent with the doctrine and therefore inapplicable. *Id.*

Magna's case is different.  Magna did not seek general damages for monies promised under a contract.  Magna seeks lost profit damages that do not arise directly from the contract with Diedrich.  Rather, the lost profits are profits Magna alleges it would have earned through operation of the Westheimer Store (i.e., through transactions with third-parties not a party to the contract Diedrich breached).  Because Magna seeks lost profits, not monies promised under the breached contract, the New York Court's reasoning, even if correct, does not apply here.  Even if the anticipatory breach doctrine relieves a plaintiff from demonstrating that the plaintiff was able to perform its obligations under the breached contract, it does not follow that a plaintiff is also relieved from demonstrating that it would be able to generate future income not provided for in the contract.

[22] The Court notes that Magna cited cases from other jurisdictions that applied a risk-free rate.  However, this Court is charged with interpreting California law.  Opinions from courts in states other than California have no binding authority on this Court.  The Court did consider the cases, along with cases from non-California jurisdictions that reached an opposite conclusion.  This Court finds more persuasive the cases in line with *Energy Capital Corp.*, 302 F.3d 1314.

are tangible operating results that can be reviewed and management in place.  While a risk-free discount rate cannot be justified, nor can the extreme risk reflected in the 27.7% rate utilized by the Diedrich's expert.  The more reasonable discount rate is 15%.

Accordingly, the Courts finds Magna's lost profit damages, discounted to present value, to be in the amount of $371,462.01.

The following table demonstrates the Court's calculations.   The Court increased the revenues, costs of goods, rent, accounting costs, and operating expenses by an inflation rate of 2.5%.

|  | Base | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Revenues | $ 595,594.00 | $ 610,483.85 | $ 625,745.95 | $ 641,389.59 | $ 657,424.33 | $ 673,859.94 |
| Cost of goods | $ 184,634.14 | $ 189,249.99 | 193,981.24 | 198,830.77 | $ 203,801.54 | $ 208,896.58 |
| Rent | $  66,211.00 | $  66,708.50 | 67,218.44 | 67,741.12 | $  68,276.88 | $  68,826.02 |
| Depreciation and amortization | $        - | $        - | $        - | $        - | $        - | $        - |
| Management fees | $  24,500.00 | $  24,500.00 | 24,500.00 | 24,500.00 | $  24,500.00 | $  24,500.00 |
| Accounting | $    5,667.00 | $    5,808.68 | 5,953.89 | 6,102.74 | $    6,255.31 | $    6,411.69 |
| Operating Expenses | $ 213,782.00 | $ 219,126.55 | 224,604.71 | 230,219.83 | $ 235,975.33 | $ 241,874.71 |
| Cash flow | $ 100,799.86 | $ 105,090.13 | 109,487.66 | 113,995.13 | $ 118,615.28 | $ 123,350.94 |

Discounted cash flow analysis

|  | Cash flow | Average discount period (in months) | Monthly discount rate | Discounted Value |
|---|---|---|---|---|
| 1 | $ 105,090.13 | 6 | 1.25% | $   96,109.36 |
| 2 | $ 109,487.66 | 18 | 1.25% | $   83,748.38 |
| 3 | $ 113,995.13 | 30 | 1.25% | $   72,929.80 |
| 4 | $ 118,615.28 | 42 | 1.25% | $   63,469.76 |
| 5 | $ 123,350.94 | 54 | 1.25% | $   55,204.71 |
|  | $ 570,539.13 |  |  | $  371,462.01 |

### ii. Consequential damages

Magna seeks consequential damages for the lost value of the Westheimer and Clear Lake Stores and a host of attorneys' fees and expenses.   The Court considers the lost value and attorney costs separately and concludes that Magna did not meet its evidentiary burden with

respect to the consequential damages.

### a. Lost Value

The lost value damages include the following:

- $150,495.00 — lost value of the allocated purchase price of the Westheimer Store.

- $150,495.00 — lost value of the allocated purchase price of the Clear Lake Store.

The alleged lost value of the allocated purchase price for the Clear Lake Store can not be included in Magna's damages. Magna contends that closure and consequent sale of the Clear Lake Store was directly caused by Diedrich's breach of the implied covenant. The evidence presented showed that the Clear Lake Store was supported by the Westheimer Store. Smith testified in deposition that the Clear Lake Store was a burden to Magna. Alone, the Clear Lake Store made insignificant, if any, profits. Any remaining value of the Clear Lake Store would be taken into account in a sale price for the Clear Lake Store. Magna has not met its burden with respect to the Clear Lake Store.[23]

The alleged lost value of the allocated purchase price for the Westheimer Store can not be included in Magna's damages. The Court is awarding Magna lost profits for the Westheimer Store. The alleged lost value would have been consumed during the period for which the Court is awarding lost profits. To award an alleged lost value of the Westheimer Store's purchase price in addition to lost profits would be to grant an impermissible double-recovery.

### b. Other Fees and Expenses

The fees and expenses include the following:

- $81,193.00 — legal fees for Magna's bankruptcy case through December 31,

---

[23] Magna's pre-trial brief on damages also contended that the Clear Lake store suffered lost profits because the Clear Lake Store's share of fixed costs increased after the Westheimer Store closed. However, at the damages trial, Magna did not introduce evidence of or seek lost profits for the Clear Lake Store.

2007.

● $50,000.00 — estimated legal fees and expenses for Magna's bankruptcy case from January 1, 2008 through the case's closure.

● $101,170.53 — for Dirk Smith's indemnity claim for deficiency on the Comerica Note.

● $28,435.00 — legal fees and expenses for Mr. Abbott, incurred pre-petition, and as Magna's attorney.

● $51, 266.25 — for legal fees for Mr. Abbot, incurred post-petition, and as Smith's personal attorney.

Smith hired Mr. Abbot to represent Magna prior to hiring Strasburger. After Strasburger was obtained, Smith retained Mr. Abbot as Smith's personal attorney. Mr. Abbot's fees and expenses in the amount of $28,435.00, and $51,266.25 are not includable. The $51,266.25 amount was incurred for work on behalf of Smith personally, not Magna. Magna is the only plaintiff in this lawsuit. The $28,435.00 amount represented fees incurred for work on behalf of Magna. However, the fee invoices included show that Abbot's fees were incurred for a variety of tasks, many unrelated to Diedrich's breach of the implied covenant. The invoices include significant time spent investigating Magna's failed claim for breach of the ADA, Comerica litigation, potential claims against T-Con properties, and claims other than the implied covenant claim. The invoice also includes numerous general entries simply stating: "Telephone conference with Mr. Smith regarding the status of this matter and the manner of proceeding." The Court has no reasonable means of determining what portion of the $28,435.00 in fees was reasonably caused by the implied covenant breach. Additionally, many entries appear to represent work duplicated by Strasburger. The Court does not see a legal or equitable basis for requiring a defendant to pay attorneys' fees to separate attorneys' for litigating the same claim. Magna has not met its burden with respect to Mr. Abbot's fees.

The bankruptcy fees in the amount of $131,193.00 are not includable. To recover consequential damages, the plaintiff must produce evidence that the damages were "foreseeable and proximately caused by the breach of a contract." *Lewis Jorge Constr. Mgmt., Inc.* 34 Cal. 4th at 969. Magna presented no direct evidence suggesting that, at the time of contract formation, Diedrich contemplated that Magna would have to file bankruptcy if Diedrich did not renew the Westheimer Store lease. The evidence presented suggested that both Diedrich and Smith thought Smith would eventually negotiate a lease directly with the Westheimer Store landlord. Magna presented no evidence establishing that Diedrich reasonably contemplated that Smith would not be able to open a new store and generate revenue from other business ventures to prevent bankruptcy. Additionally, Magna's coffee Stores struggled financially from the date of Magna's purchase. The Court will not presume the causation element of consequential damages.

The $101,170.53 amount for Dirk Smith's indemnity claim is not includable. The indemnity claim arises from Smith's personal guarantee on the Comerica note. The only evidence produced on the alleged indemnity damage was a copy of the guarantee singed by Dirk and Julie Smith. Magna introduced no evidence on the foreseeable and causation elements of consequential damages. Moreover, the primary obligor was Magna. Smith guaranteed Magna's debt. Though Smith can look to Magna for indemnity, Magna can not recover a possible indemnity claim based on a damages suit against Diedrich. The Comerica debt was owed regardless of Diedrich's conduct. Magna's damage recovery takes into account the impact of Diedrich's conduct on Magna's ability to pay the note. To allow the indemnity claim would double count amounts owed to Comerica. Magna does not owe the Comerica note twice.

Magna's damage evidence consisted largely of expert testimony on the Westheimer Store's lost profits. Evidence of a monetary amount is insufficient. Consequential damages can

not be "presumed from the mere breach" of a contract. *Lewis Jorge Constr. Mgmt.*, 34 Cal. 4th at 969 (quoting *Mitchell*, 71 Cal. at 168). California law does not allow a plaintiff to recover consequential damages for any economic harm related to a contract breach, however remote and inevitable.

### iii. Mitigation

The defendant, Diedrich, bears the burden of proving the doctrine of mitigation (also referred to as the "doctrine of avoidable consequences"). *State Dept. of Health Servs. v. Superior Court*, 79 P.3d 556, 564 (Cal. 2003) ("The defendant bears the burden of pleading and proving a defense based upon the avoidable consequences doctrine."); *Millikan v. Am. Spectrum Real Estate Servs. Cal., Inc.*, 12 Cal. Rptr. 3d 459, 466 (Cal. App. 4th Dist. 2004) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract.").

The mitigation doctrine requires a plaintiff to take "reasonable steps" to mitigate damages caused by a defendant's conduct. *Valle de Oro Bank. v. Gamboa*, 32 Cal. Rptr. 2d 329, 331 (Cal. App. 4th Dist. 1994). "The duty to mitigate damages does not require an injured party to do what is unreasonable or impractical." *Id.* (citing *Valencia v. Shell Oil Co.*, 23 Cal. 2d 840, 846 (Cal. 1944). "Under the avoidable consequences doctrine as recognized in California, a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditures." *State Dept. of Health Servs.*, 79 P.3d at 564. "The reasonableness of the injured party's efforts must be judged in light of the situation existing at the time and not with the benefit of hindsight." *Id.* (citing *Green v. Smith*, 361 Cal. App. 2d 392, 396 (Cal. App. 2d 1968)). "The standard by which the reasonableness of the injured party's efforts is to be measured is not as high as the standard required in other areas

of law." (citing *Green,* 361 Cal. App. 2d at 397).

Diedrich has not met its burden on mitigation. Based on documents presented and Smith's testimony, the Court finds that Magna undertook reasonable efforts to mitigate Magna's damages. Smith testified that he negotiated with T-Con, the Westheimer Store owner. The Court has no question that Smith did all he reasonably could to obtain a new lease with T-Con. Because Smith reasonably believed he would have a new lease directly with T-Con, Smith's time to mitigate damages was also significantly reduced. Smith investigated new locations. Smith testified that he attempted to renegotiate his loan with Comerica. Diedrich did not introduce sufficient evidence to overcome Smith's testimony that the investigation of new locations and talks with Comerica were in good faith and with serious intent.

Magna may have been able to open a new store. Locations were available. Smith had approximately $3.5 million in assets. However, the fact that a course of action may be feasible does not mean that it is also reasonable. The mitigation doctrine only requires plaintiffs to undertake reasonable efforts to mitigate their loss. *Valle de Oro Bank*, 32 Cal. Rptr. 2d at 331. Under the circumstances, the Court does not find that it would have been reasonable for Magna to build a new store. Testimony and documents indicated that a portion of the Westheimer Store's value arose from its unique architecture and location. Evidence presented suggested construction of a new store would have cost approximately $350,000.00 to $500,000.00. The majority of Smith's assets were personal, non-liquid assets. This adversary proceeding was asserted by Magna, not Smith. Diedrich cites no law requiring a principal to use the principal's personal assets to mitigate damages to the principal's corporation. Moreover, Smith testified that he talked with Comerica about financing a new store but Comerica was unwilling to finance the estimated expense. Smith had an outstanding loan with Comerica in the amount of

approximately $550,000.00.   Considering Smith's existing loan and assets, it is unlikely that Smith could have obtained financing to build a new store.

**Conclusion**

Magna, as the prevailing party, is entitled to $275,000.00 in attorneys' fees and costs. Magna incurred lost profits damages in the amount of $371,462.01.   Pursuant to California law, the Court awards pre-judgment interest on the lost profits damages at 10%, accruing from the date of this adversary proceeding.[24]  The interest-adjusted lost profits damages amounts to $403,825.00.   Based on the foregoing, the Court orders judgment for Magna in the amount of $678,825.00.   Post-Judgment interest will be awarded.

Signed at Houston, Texas, on May 9, 2008.

MARVIN ISGUR
United States Bankruptcy Judge

---

[24] "[P]rejudgment interest is a substantive aspect of a plaintiff's claim, rather than a merely procedural mechanism." *In re Exxon Valdez*, 484 F.3d 1098, 1101 (9th Cir. 2007).   Consequently, California law governs prejudgment interest in this case. *Id.*; *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002) ("Prejudgment interest in a diversity action is thus a substantive matter governed by state law.").

Section 3289 of the California Civil Code governs interest rates for contract actions arising from breaches of contracts entered into after January 1, 1986.   West's Ann. Cal. Civ. Code § 3289.   Section 3289 provides that contracts shall bear the interest rate stipulated in the contract, or a default rate of 10%.   The Westheimer Franchise Agreement did not stipulate an interest rate.   The agreement provided that the interest rate shall be "the highest rate permissible by applicable law."   Consequently, the Court applies a 10% prejudgment interest rate.

Section 3287 of the California Civil Code governs the date from which prejudgment interest accrues.   West's Ann. Cal. Civ. Code § 3287; *North Oakland Medical Clinic v. Rogers*, 65 Cal. App. 4th 824, 828 (Cal. App. 1 Dist. 1998). Section 3287(a) governs liquidated damages and § 3287(b) governs unliquidated damages. *Id.* Magna's lost profit damages were not liquidated and therefore are subject to § 3287(b).   Section 3287(b) grants the Court discretion to award prejudgment interest from a date prior to entry of judgment, but no earlier than the date the action was filed. *Id.*   Based on the equities of the case, the Court awards prejudgment interest from June 26, 2007, the date Magna's cause of action was filed.